**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ALAN MEYER and DAVID CORNELIUS,

      Plaintiffs,

      v.

PANERA BREAD COMPANY,

      Defendant.

Case No. 1:17-cv-02565-EGS-GMH

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR**
**CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE**
**PURSUANT TO THE FLSA AND THE D.C. MINIMUM WAGE ACT**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 3

II.  PROCEDURAL HISTORY AND TOLLING ISSUES ..................................... 6

   A.  The Tolling Agreement Does Not Extend the Statute of Limitations Based on the Date That Plaintiffs Meyer and Cornelius Filed the Original Complaint .............. 6

   B.  This Court Should Deny Plaintiffs' Request for Equitable Tolling ....................... 8

III.  FACTUAL BACKGROUND ............................................................................. 8

   A.  Plaintiffs Have Limited Knowledge About the Putative Collective as They Worked in Just Seven Cafes and for Only a Fraction of the Relevant Time ....................... 8

   B.  Notwithstanding Their Limited Experience, Plaintiffs Request Certification of a Collective Including 3,015 Assistant Managers Across 828 Cafes ..................... 10

   C.  The Nature and Extent of Management Duties Each Assistant Manager Performed Varied from Cafe to Cafe (and Even Within the Same Cafe) .............................. 13

       1.  Individuals Whom Plaintiffs Identified as Similarly to Them Have Since Testified That They Primarily Performed Managerial Duties ................. 13

       2.  Plaintiffs' and the Opt-Ins' Declarations Are Contradicted by Their Own Prior Statements and Actions ................................................... 17

       3.  Plaintiffs Rely on Declarations From Another Lawsuit That Were Undercut By the Declarants' Later Deposition Testimony ...................................... 18

       4.  The U.S. DOL Investigated Multiple Panera Cafes and Determined That Assistant Managers Were Correctly Classified as Exempt ...................... 20

   D.  Assistant Manager Training Was Management-Focused and Individualized ...... 21

   E.  Almost 76% of the Assistant Managers Plaintiffs Purport to Include in This Lawsuit Are Subject to Binding Arbitration Agreements .................................................. 23

   F.  The Collective Conditionally Certified in *Covelli Enterprises* Involves a Different Employer, a Different Circuit's Law, and Different Evidence ............................. 24

IV.  ARGUMENT AND ANALYSIS ...................................................................... 25

   A.  Where Some Discovery Has Been Completed, a Higher Standard Applies ......... 26

   B.  The Evidence and the Nature of Plaintiffs' Claims Shows that Collective Litigation Would Be Unmanageable and Inefficient ............................................................. 28

   C.  Plaintiffs Fail to Prove That They and Members of the Proposed Nationwide Collective Are "Similarly Situated" With Respect to Job Duties ......................... 29

   D.  Plaintiffs' Evidence Does Not Establish Similarity Between Their Duties and the Duties of the More Than 3,000 Individuals They Seek to Represent .................. 31

       1.  Plaintiffs' Testimony Fails to Establish That They Are "Similarly Situated" to Each Other or the Putative Collective Members .................................. 31

2.      Other Lawsuits Challenging Assistant Managers' Exempt Classification Do Not Establish That Plaintiffs Are "Similarly Situated" to Each Other or the Putative Collective Members ..................................................................... 35

3.      Plaintiffs Fail to Identify, Much Less Establish, a Common, Unlawful Policy That Binds the Massive Nationwide Collective ............................ 38

4.      Hourly-Nonexempt Assistant Managers Are Not "Similarly Situated" to Salaried-Exempt Assistant Managers ....................................................... 40

E.      Plaintiffs Are Not "Similarly Situated" With Members of the Putative Collective for the Additional Reason That the Vast Majority of Them Are Bound by Agreements to Arbitrate Their Claims on an Individual Basis ............................ 42

V.      IF THIS COURT CERTIFIES A COLLECTIVE, IT SHOULD REJECT PLAINTIFFS' PROPOSED NOTICE AND CONSENT FORM ........................................................... 43

VI.     CONCLUSION ............................................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68 (D.N.J. 2014).......................................................42

*Ahmed v. T.J. Maxx Corp.*, 2014 WL 5280423 (E.D.N.Y. 2014), *aff'd*, 103 F. Supp. 3d 343 (E.D.N.Y. 2015)...................................................................................................................................35

*Alvirde v. Fresh Farms International, Inc.*, 2014 WL 7265072 (N.D. Ill. 2014)..........................37

*Ayala v. Tito Contractors*, 12 F. Supp. 3d 167 (D.D.C. 2014) .......................................................32

*Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709 (E.D. La. 2004)............................................27

*Becerra v. IM LLC-I*, 2016 WL 8968978 (E.D.N.Y. 2016) ...........................................................37

*Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp. 2d 1289 (N.D. Ga. 2012) ...................33

*Blount v. U.S. Security Associates*, 945 F. Supp. 2d 88 (D.D.C. 2013).........................................32

*Bouthner v. Cleveland Construction, Inc.*, 2012 WL 738578 (D. Md. 2012) ...............................33

*Bramble v. Wal-Mart Stores, Inc.*, 2011 WL 1389510 (E.D. Pa. 2011)............................27, 31, 38

*Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255 (S.D.N.Y. 2017) .....................30, 33, 38, 40

*Byard v. Verizon West Virginia, Inc.*, 287 F.R.D. 365 (N.D. W. Va. 2012)...........................43, 44

*Castillo v. P&R Enterprises, Inc.*, 517 F. Supp. 2d 440 (D.D.C. 2007) .................................32, 43

*Chase v. AIMCO Properties, LP*, 374 F. Supp. 2d 196 (D.D.C. 2005) .........................................32

*Chemi v. Champion Mortgage*, 2006 WL 7353427 (D.N.J. 2006)................................................38

*Conde v. Open Door Marketing, LLC*, 223 F. Supp. 3d 949 (N.D. Cal. 2017) ............................43

*Cryer v. Intersolutions, Inc.*, 2007 WL 1053214 (D.D.C. 2007)..................................7, 31, 32, 43

*Delgado v. Otho-McNail, Inc.*, 2007 WL 2847238 (C.D. Cal. 2007)............................................44

*Dillow v. Home Care Network, Inc.*, 2017 WL 2418738 (S.D. Ohio 2017).................................44

*Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49 (D.D.C. 2012)........................................28, 29

*Dreyer v. Altchem Environmental Services, Inc.*, 2007 WL 7186177 (D.N.J. 2007)...................30

*Eley v. Stadium Group, LLC*, 2015 WL 5611331 (D.D.C. 2015).................................................32

*Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3 (D.D.C. 2010) .......................................................32

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) ........................................................2

*Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. 2009)....................................37

*Epic Sys. Corp. v. Lewis*, No. 16-285, 2018 WL 2292444 (U.S. May 21, 2018)...........................1

*Federman v. Bank of America*, 2016 WL 3090631 (D.N.J. 2016) ..........................................38, 39

*Fischer v. Kmart Corp.*, 2014 WL 3817368 (D.N.J. 2014).............................................................42

*Freeman v. MedStar Health Inc.*, 187 F. Supp. 3d 19 (D.D.C. 2016) ...........................................31

*Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797 (S.D.N.Y. 2012)................................30, 39

*Harriel v. Wal-Mart Stores, Inc.*, 2012 WL 2878078 (D.N.J. 2012)........................................29, 40

*Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989)......................................................4, 30

*Holesapple v. E-Mortgage Management, LLC*, 2011 WL 6887684 (D.N.J. 2011)........................33

*Holley v. Erickson Living*, 2012 WL 1835738 (E.D. Pa. 2012) .....................................................27

*Hughes v. Township of Franklin*, 2014 WL 1428609 (D.N.J. 2014)...............................................33

*Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113 (D.D.C. 2004)......................................................4, 41

*In re Morgan Stanley Smith Barney LLC*, 2016 WL 1407743 (D.N.J. 2016) ................................30

*Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475 (S.D.N.Y. 2016) ...........................................26

*Libasci v. Singares*, 128 A.D.3d 1239 (N.Y. App. Div. 2015).........................................................6

*McCoy v. RP, Inc.*, 2015 WL 6157306 (D.S.C. 2015).....................................................................44

*McKinney v. United Stor-All Centers, Inc.*, 585 F. Supp. 2d 6 (D.D.C. 2008).............................32

*McKnight v. Honeywell Safety Products, USA*, 2017 WL 3447894 (D.R.I. 2017) ...........27, 30, 33

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)..................................................................7

*Mendoza v. Casa de Cambio Delgado, Inc.*, 2008 WL 3399067 (S.D.N.Y. 2008)........................36

*Morangelli v. Chemed Corp.*, 2010 U.S. Dist. LEXIS 146149 (E.D.N.Y. 2010).........................42

*Nevada v. Department of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016)......................................10

*Purdham v. Fairfax County Public Schools*, 629 F. Supp. 2d 544 (E.D. Va. 2009) ...............29, 30

*Reed v. Empire Auto Parts, Inc.*, 2015 WL 761894 (D.N.J. 2015) ................................................35

*Rivera v. Power Design, Inc.*, 172 F. Supp. 3d 321 (D.D.C. 2016)................................32

*Rogers v. Ocean Cable Group, Inc.*, 2011 WL 6887154 (D.N.J. 2011).........................39

*Rowe v. Hospital Housekeeping Systems, LLC*, 2018 WL 733228 (E.D. La. 2018) ....................29

*Shaia v. Harvest Management Sub LLC*, 306 F.R.D. 268 (N.D. Cal. 2015) ................................43

*Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443 (E.D.N.Y. 2014) .....................................43

*Sloane v. Gulf Interstate Field Services*, 2017 WL 1105236 (M.D. Pa. 2017) ............................26

*Souryavong v. Lackawanna County*, 872 F.3d 122 (3d Cir. 2017)..................................7

*Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189 (3d Cir. 2011) ...........................29

*Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682 (D. Md. 2010)............................................29

*Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011) ...............................................................28

*Walker v. Jefferson County Board of Education*, 2016 WL 1117643 (N.D. Ala. 2016) ..............37

## **Statutes**

29 C.F.R. § 541.100 ..................................................................................................2

29 C.F.R. § 541.200 ..................................................................................................2

29 C.F.R. § 541.708 ..................................................................................................2

9 U.S.C. § 2..........................................................................................................23, 24

29 U.S.C. § 213........................................................................................................2

29 U.S.C. § 216(b) ...................................................................................................1

29 U.S.C. § 255(a) ...................................................................................................7

29 U.S.C. § 256........................................................................................................43

D.C. Code §§ 32-1001, *et seq.*.................................................................................26

## **Miscellaneous**

Labor & Employment on Bloomberg Law, *Supreme Court Warms Up 'Thousands' of Former Worker Claims* (May 22, 2018) ..................................................................................1

## I.     INTRODUCTION

While Plaintiffs' Renewed Motion for Conditional Certification and Court-Authorized Notice (Dkt. 36 ("Pls.' Mot.")) differs only slightly from their earlier-filed motion (Dkt. 11)—adding just two Opt-In Plaintiffs during the intervening four months—the legal landscape in which the motion must be considered has shifted considerably in ways that weaken the case for conditional certification on the claims and evidence presented here.

First, the United States Supreme Court has made clear that courts may not view mandated individual arbitration as a legally uncertain alternative to collective or class litigation and must enforce the terms of the arbitration agreements before them. *See Epic Sys. Corp. v. Lewis*, No. 16-285, 2018 WL 2292444, at *8 (May 21, 2018).[1] In a case such as this, where almost 76% of the potential collective members are presumed to be bound to individual arbitration, certifying a collective including those individuals not only ensures that the collective members will not be "similarly situated," as Section 216(b) of the Fair Labor Standards Act ("FLSA") requires for collective treatment, but subjects Defendant Panera, LLC ("Panera") to protracted classwide discovery and motion practice in a litigation setting and thus needlessly burdens the contractual right to individual arbitration. Whether to certify a collective is within the Court's discretion and, on the evidence presented, including but not limited to the arbitration agreement, this Court should exercise its discretion to deny Plaintiffs' Motion.

Second, the Supreme Court has leveled the statutory playing field, confirming that the FLSA's overtime pay requirements must not be "broadly interpreted" while the Act's overtime

---

[1] Indeed, in the words of Plaintiffs' lead counsel in this case, plaintiffs in litigation stayed pending a decision in *Epic* should be advised that "**they will not be able to proceed as a class action and that the best way to vindicate their rights is to file an individual arbitration**...." Labor & Employment on Bloomberg Law, *Supreme Court Warms Up 'Thousands' of Frozen Worker Claims* (May 22, 2018) (available at http://www.bna.com/supreme-court-warms-n57982092763).

exemptions are "narrowly construed." Rather, "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.'" *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (reasoning that the overtime exemptions "are as much a part of the FLSA's purpose as the overtime-pay requirement"). Plaintiffs' claims turn on their contention that they and other salaried Assistant Managers were misclassified as exempt and Panera's defense that they were not. (Pls.' First Am. Compl. (Dkt. 29) ¶¶ 2, 8, 39; Def.'s Answer (Dkt. 35), at 32 (Seventh Defense).) The Supreme Court's ruling in *Encino Motorcars* means that courts should not permit plaintiffs to attempt to gain settlement leverage through nationwide certification of a misclassification collective by vaguely invoking the FLSA's broad remedial purposes—as Plaintiffs do here (*see* Pls.' Mot. at 8, 22)—and that they must carefully consider both a defendant's equal right to assert a statutory exemption defense and how that defense would be litigated. It means that whether a requested group of individuals are "similarly situated" must be considered in light of all available evidence bearing on whether an exemption is likely to apply to some, most, or all members of a purported collective. Without determining the merits of Plaintiffs' claims, this Court must consider the legal context—claims centering on *duties-based* statutory exemptions to the FLSA's overtime requirements—in which certification is sought.[2]

---

[2] Relevant statutory exemptions are set forth in 29 U.S.C. § 213. *See also* 29 C.F.R. § 541.100 (executive employee exemption applies when employee's "primary duty is management of the enterprise," the employee directs two or more employees, and has power to hire and fire or make suggestions about employment status that are "given particular weight"); *id.* § 541.200 (administrative exemption applies when employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and who exercises "discretion and independent judgment with respect to matters of significance"); *id.* § 541.708 ("Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption.").

Plaintiffs' Motion accounts for neither of these significant legal developments. It remains based on legally irrelevant operational documents and vague declaration assertions presented by a handful of former Assistant Managers who worked briefly in a few of Panera's more than 800 company-owned stores. More specifically, despite the pendency of this dispute for more than two years, *only six* individuals have joined this litigation and offered (limited) testimony from five relevant jurisdictions: one from Washington, D.C. (Meyer), two from Alabama (Cornelius and Willms), one from Virginia (Romano), one from North Carolina (Thomas), and one from Wisconsin (Tymus).[3] These individuals constitute less than .2% of the purported collective of more than 3,000 members.[4] They worked in about 7 locations, or less than 1% of Panera's company-

---

[3] The lack of demonstrated interest—viewed in the context of the enormous burden that nationwide certification will place on the court and the parties—should be weighed against granting certification as the court exercises its discretion whether and how this matter should proceed collectively. While Joseph Whitfield also has joined and submitted a declaration, he worked only in a Massachusetts cafe excluded from this litigation. (*See infra* notes 4-5; Dkt. 36-9, Whitfield Decl. ¶ 1.) Wherever cited in support of Plaintiffs' motion, his testimony offers nothing relevant to the claims in this litigation and therefore should be given no weight.

[4] Information concerning the size and scope of Plaintiffs' proposed collective is based on *salaried-exempt* Assistant Managers who worked for Panera in D.C. and each state except Massachusetts, New Jersey, New York, or California from June 5, 2015 through November 16, 2016, after which time Panera had completed its reclassification of the Assistant Manager position as an hourly-nonexempt role. (**Exhibit A**, Decl. of Jaynanne Calaway-Habeck ("Calaway-Habek Decl") ¶ 7.) This is consistent with Plaintiffs' Motion (Dkt. 36-1 at 7, 16 n.6), and their First Amended Complaint defining the would-be collective as consisting of "all similarly situated AMs *whom Defendant classified as exempt* from overtime requirements, who worked more than 40 hours a week for Defendant in the United States—excluding New York, New Jersey, and Massachusetts….." (Dkt. 29 ¶ 39 (emphasis added); *see also id.* ¶ 40 (similarly defining DCMWA Collective).) Furthermore, in their reply in support of their earlier-filed motion for conditional certification, Plaintiffs expressly stated, "To be clear, Plaintiffs only seek to send notice to AMs who worked during the period that Defendant classified them as exempt," i.e., until, at the latest, November 16, 2016. (*See* Dkt. 20 at 20.) Opt-In Thomas confirmed in her declaration that Assistant Managers were reclassified in 2016. (Dkt. 36-19, Thomas Decl. ¶ 7.) The earlier reply also clarifies that California AMs are not within the requested collective because they were classified as exempt during the relevant period. (Dkt. 20 at 1 n.1.) To the extent, if any, that Plaintiffs purport to include in the collective individuals who worked only as *hourly-nonexempt* Assistant Managers, as the Renewed Motion vaguely suggests (*see* Pls.' Mot. at 7, 21)—contrary to their own Complaint and prior statements—the collective would be much larger.

owned stores. But Plaintiffs' me-too lawsuit, following on an earlier-filed case challenging Assistant Managers' classification in company-owned cafes in three states,[5] nonetheless seeks to shoehorn them all into a nationwide collective as a bludgeon to secure a windfall settlement.

Plaintiffs shoulder the burden of making a factual showing that they and the thousands of individuals whose claims they seek to decide in a single litigation are sufficiently "similarly situated" so as to create judicial efficiency by permitting their claims to be decided through representative proof. *See generally Hunter v. Sprint Corp.,* 346 F. Supp. 2d 113, 119 (D.D.C. 2004) ("The requirement that proposed class members be "similarly situated" to the named plaintiffs ensures that the collective action promotes the 'efficient resolution of common issues of law and fact arising from the same alleged [unlawful] activity.'" (quoting *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989)). Even on the limited record before the Court, it is abundantly clear that representative proof cannot be used to show that all Assistant Managers nationwide performed the same primary duties and permit a collective-wide determination of improper classification. Besides the six self-serving Plaintiff and Opt-In Plaintiff declarations (Dkt. 36-5, 36-6, 36-7, 36-8, 36-19, and 36-20)—which are nearly identical to one another, devoid of basic detailed facts, and lacking foundational basis—the only evidence on which Plaintiffs rely is: (i) a sampling of job postings for the Assistant Manager position, which upon even cursory inspection contain no information regarding duties of the job; (ii) Panera's public filings with the SEC, which contain high-level information about the number of cafes owned and operated by Panera and which provide no evidence about duties performed by Assistant Managers; (iii) the fact that Assistant Managers were, until mid- to late-2016, classified as overtime-exempt; and (iv) some other

---

[5] *Friscia v. Panera Bread Company and Panera, LLC,* No. 16-cv-03754 (D.N.J.) (hereinafter "*Friscia*"), which purports to cover employees from New York, New Jersey, and Massachusetts.

litigation filed against legally separate franchisees challenging the exempt classification of their

assistant managers. (Pls.' Mot. at 13.[6])

Standing in contrast to Plaintiffs' superficial indicators of similarity is substantial record

evidence revealing dissimilarities among them and those they seek to represent.

- Individuals *whom Plaintiffs and Opt-Ins identify by name* as purportedly similar to them have testified that they are, in fact, not similarly situated to Plaintiffs because their primary duty was management of their respective cafes. These managers' testimony makes clear that Plaintiffs are not similarly situated to those they seek to represent, including even the Assistant Managers from the handful of cafes where they worked. *See infra* Section III.C.1.

- Certain of Plaintiffs' and the Opt-Ins' allegations contradict their own past written statements (such as online profiles) and other documentary evidence (such as Panera personnel records) regarding the duties they performed as Assistant Managers. This evidence shows that Plaintiffs and the Opt-Ins are not similarly situated *even to each other* because several of them admittedly performed the very management tasks they all now self-servingly attempt to disclaim. *See infra* Section III.C.2.

- Plaintiffs are not like one another in that one of them, Opt-in Plaintiff Michele Thomas, is subject to an individual arbitration agreement, while the other five are not. Furthermore, almost 76% of the Assistant Managers in the putative collective are unlike Plaintiffs other than Thomas for the additional reason that they are subject to binding bilateral arbitration agreements. *See infra* Section III.E.

In short, Plaintiffs fail to carry their burden of demonstrating that they are similarly situated

to each other, much less the thousands of former salaried Assistant Managers they seek to

represent, with respect to their day-to-day duties and experiences in the role. There is no evidence

whatsoever of an unlawful policy or practice uniformly applied to all members of the purported

collective on which nationwide liability could be premised. Duties actually performed by each

Assistant Manager will be the focal point of this litigation, and they must be individually examined

---

[6] Plaintiffs also cite declarations from the plaintiff (Jacqueline Friscia) and her aunt (Diana Manrique) in the *Friscia* litigation (Dkt. 36-10 and 36-11), both of which were later contradicted by the declarants' own deposition testimony and, moreover, do not relate to the jurisdictions at issue here. *See infra* Section III.C.3. Defendants in *Friscia* have moved to strike the Friscia and Manrique declarations, but that motion has not yet been decided.

to ascertain Panera's exemption defenses to Plaintiffs' misclassification claims. For these reasons, detailed more fully below, this Court should deny Plaintiffs' Motion under both the FLSA and the D.C. Minimum Wage Act.

## II.   PROCEDURAL HISTORY AND TOLLING ISSUES

### A.   The Tolling Agreement Does Not Extend the Statute of Limitations Based on the Date That Plaintiffs Meyer and Cornelius Filed the Original Complaint

Plaintiffs' recitation of the history of this case (Pls.' Mot. at 2-3) requires clarification on a particularly important matter: the impact of the alleged Tolling Agreement between Panera and Plaintiffs. (Dkt. 36-14.) That agreement does not operate to extend the FLSA's statute of limitations in the manner Plaintiffs claim. First, given the parties' continuing divergent interpretations of the agreement and the fact that Plaintiffs did not file suit until ten months after it expired, it is unclear whether there was any meeting of the minds to form a binding agreement to toll the statute with respect to any and all claims asserted in this much later-filed lawsuit.[7]

In any event, there is no basis in law for Plaintiffs' claim that the Tolling Agreement serves to extend the date by which opt-in plaintiffs may timely file consent-to-join forms back *more than*

---

[7] The agreement is not unambiguous on its face. First, paragraphs 1 and 3 of the purported agreement cannot be read together to create an unambiguous agreement regarding whether, if at all, tolling applies to claims asserted some ten months or more after the agreement's termination. Furthermore, in two important paragraphs (the "NOW, THEREFORE" clause and paragraph 4 ("Use of Agreement")), the document includes the notation "[plaintiff names to be inserted]." (Dkt. 36-14.) For this reason alone, it is apparent that the parties could not have had a meeting of the minds regarding the intent and effect of the purported agreement. In addition, no specific consideration is defined. Given this facial ambiguity, the court may be called upon to consider parol evidence to determine whether, if at all, and how the tolling agreement should operate with respect to Plaintiffs,' Opt-In Plaintiffs, ' and other purported collective members' claims. *See, e.g., Libasci v. Singares,* 128 A.D.3d 1239, 9 N.Y.S.3d 715, 717 (N.Y. App. Div. 2015) (owner of a condominium unit could use parol evidence to show that there was no meeting of the minds regarding consideration and thus no contract between her and a co-owner plaintiff to divide proceeds from sale of unit in a particular way; "'[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms' and consideration") (internal citations omitted). (The purported agreement includes a New York choice-of-law provision. (Dkt. 36-14 ¶ 7.).)

*four years* to March 25, 2014 by adding 249 days (the claimed tolling period) to the date three years prior to the date that Plaintiffs Meyer and Cornelius filed their original complaint (i.e., November 29, 2014). (*See* Pls.' Mot. at 3, 5 & n.3.) Leaving aside the multiple dubious assumptions embodied in this argument—e.g., that Plaintiffs' First Amended Complaint would necessarily "relate back" to the date the original complaint was filed, and that a three-year rather than two-year statute of limitation applies to Plaintiffs' claims[8]—the FLSA expressly provides that the timeliness of a collective action member's claim must be assessed *based on the date that they consent to join* (or "opt in" to) the litigation, *not* the filing of the complaint. 29 U.S.C. §§ 216(b), 256 (as Plaintiffs acknowledge, *see* Dkt. 36-1, Pls.' Mot. at 12).

Thus, even using the date of Plaintiffs' Motion (i.e., June 5, 2018) as the basis for defining a potential collective's temporal scope is generous well beyond what the FLSA envisions. *See Cryer v. Intersolutions, Inc.,* 2007 WL 1053214 (D.D.C. 2007) (Sullivan, J.) (basing the class period defining those who would receive notice on the date notice was issued, not on the complaint date or the date conditional certification was sought). While notice should not issue for the reasons stated herein, using the date of the Amended Complaint to fix the alleged collective's temporal scope would be inconsistent with the FLSA and would guarantee unnecessary, time-consuming, and expensive discovery. *See also* Def.'s Notice of Objections to Plaintiffs' Proposed Notice, Method of Notice and Consent to Join Form ("Notice of Objections"), filed together herewith.

---

[8] The standard limitations period for FLSA claims is two years. 29 U.S.C. § 255(a). Only in extraordinary cases where plaintiffs prove a willful violation will a three-year period apply. *Id.*; *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 130 (1988); *Souryavong v. Lackawanna Cty.,* 872 F.3d 122, 128 (3d Cir. 2017) (denying three-year period and confirming that willfulness requires subjective knowledge of specific alleged violation). Nothing in Plaintiffs' First Amended Complaint or their Motion supports a willful violation; a two-year period applies.

**B.     This Court Should Deny Plaintiffs' Request for Equitable Tolling**

By both a separate motion (Dkt. 31) and in their present certification motion (Dkt. 36-1, Pls.' Mot. at 2-3, 21-22, 27), Plaintiffs ask this Court to equitably toll the statute of limitations for the period from January 30, 2018, when their original certification motion was filed (Dkt. 11), until the Court rules on this, their second certification motion. For the reasons set forth in Panera's response to Plaintiffs' separate motion—including the fact that any delay in filing a complaint against the proper defendant falls squarely on Plaintiffs' shoulders—that motion should be denied.

## III.   FACTUAL BACKGROUND

**A.     Plaintiffs Have Limited Knowledge About the Putative Collective as They Worked in Just Seven Cafes and for Only a Fraction of the Relevant Time**

Despite seeking conditional certification of a collective spanning virtually the entire country, Plaintiffs and the Opt-In Plaintiffs worked for Panera as salaried-exempt Assistant Managers in only a combined seven cafes in four states and D.C. (*See* Dkt. 36-5, Meyer Decl. ¶ 1 (one cafe in D.C.), Dkt. 36-6, Cornelius Decl. ¶ 1 (one cafe in Alabama), Dkt. 36-7, Romano Decl. ¶ 1 (one cafe in Virginia); Dkt. 36-8, Willms Decl. ¶ 1 (one cafe in Alabama); Dkt. 36-19, Thomas Decl. ¶¶ 5-6 (two cafes in North Carolina); Dkt. 36-20, Tymus Decl. ¶ 1 (one cafe in Wisconsin).[9])

Moreover, each Plaintiff worked at his or her respective cafe for only a fraction of the relevant time period, which narrowly limits their claimed personal knowledge about Assistant Manager job duties and their ability to observe other Assistant Managers performing their jobs. Plaintiff Meyer's tenure at his cafe lasted only about six months, from April 2015 to approximately October 2015. (Dkt. 36-5, Meyer Decl. ¶ 1; **Exhibit F**, Declaration of Courtney Higgins ¶ 6.) Plaintiff Cornelius's term as an Assistant Manager was similarly brief, spanning a six-month

---

[9] Two Plaintiffs also claim to have "filled in" at one other location. (Dkt. 36-5, Meyer Decl. ¶ 17; Dkt. 36-20, Tymus Decl. ¶ 20.) By definition, any such assignment (if proven) would be brief.

period from January 2015 to June 2015.[10] (*Id.*) Opt-In Plaintiff Romano worked at her cafe for only four months, from August 2016 to November 2016. (Dkt. 36-7, Romano Decl. ¶ 1.) Opt-In Steven Willms has not been employed by Panera since October 2014. (Dkt. 36-8, Willms Decl. ¶ 1.) Opt-In Elizabeth Tymus's Assistant Manager tenure was similarly brief, spanning from late July 2015 until March 1, 2016. (Dkt. 36-20, Tymus Decl. ¶ 1; Higgins Decl. ¶ 6.) Thus, for substantial parts of the expansive period for which Plaintiffs seek nationwide certification, no testimony has been offered at all, or they have presented testimony from only one or two individuals.[11] This is not enough to support a finding that all Assistant Managers nationwide were similarly situated in their duties.

Panera completed its reclassification of Assistant Managers on November 16, 2016, making that the last possible date on which any person could have worked as a salaried-exempt employee in that role. (Dkt. 36-12, Declaration of Panera's Vice President of Human Resources, Jaynanne Calaway-Habeck ¶ 5 (filed in *Friscia* (discussed below) and submitted by Plaintiffs in support of their Renewed Motion) ("Calaway-Halbeck/*Friscia* Decl."); **Exhibit E**, Decl. of Steve Lisner ¶ 6; **Exhibit B**, Decl. of Angie Falkner ¶ 3.) Panera did so in the face of the U.S. Department of Labor's ("DOL") proposed changes to the FLSA's overtime exemption rules, which were finalized in May 2016 and set to take effect on December 1, 2016. The new rules required that exempt managers like Plaintiffs be paid a salary of at least $47,476, more than double the prior

---

[10] In his declaration, Cornelius claims to have worked in the Assistant Manager role from November 2015 - August 2016. (Dkt. 36-6, Cornelius Decl. ¶ 1.) He did not. (Higgins Decl. ¶ 6.)

[11] For instance, only Opt-In Willms worked in 2014, and he worked only until October of that year. (Dkt. 36-8 ¶ 1.) In all of 2016, no more than two Plaintiffs worked in any given month: Tymus and Thomas in January and February; Thomas and Romano in August through November; and only Thomas the other eight months. (Dkt. 36-19, Thomas Decl. ¶¶ 1-2, 36-20, Tymus Decl.¶ 1, 36-7, Romano Decl. ¶ 1; Higgins Decl. ¶ 6.)

threshold.[12] Panera had already reclassified Assistant Managers by November 22, 2016 when the rules were temporarily enjoined just nine days before the rules were to take effect. *See Nevada v. DOL*, 218 F. Supp. 3d 520 (E.D. Tex. 2016).[13]

### B.   Notwithstanding Their Limited Experience, Plaintiffs Request Certification of a Collective Including 3,015 Assistant Managers Across 828 Cafes

During the three-year period preceding Plaintiffs' Motion, Panera owned and operated a massive, decentralized group of approximately 828 cafes in the nearly nationwide area Plaintiffs place at issue. (Higgins Decl. ¶ 5.) Approximately 3,015 salaried-exempt Assistant Managers (including Plaintiffs) worked in the cafes during that time, almost 74% of whom (2,220) worked outside D.C. and the four states where Plaintiffs and the Opt-Ins worked. (*Id.*)

Cafes were divided into markets, each of which totaled approximately 8 to 12 cafes apiece (though they could be smaller or larger depending on various factors), and each market was led by a Joint Venture Partner ("JVP"). (Calaway-Habeck Decl. ¶ 6.)[14] JVPs were not in the cafe on a daily basis, and instead relied on each cafe management team, including the salaried Assistant Manager(s), to drive operations. (Lisner Decl. ¶ 4.[15]) Each market was, in turn, part of a region,

---

[12] Some Assistant Managers, including Plaintiff Cornelius and Opt-In Willms, made less than the proposed minimum salary requirement for exemption at that time. (Higgins Decl. ¶ 6.) Notwithstanding any suggestion by Plaintiffs to the contrary, Panera was under no legal, business, or other obligation to raise the salaries of Assistant Managers to comply with the new rule, which, notably, included an provision that would have increased the minimum salary every three years.

[13] Only Opt-In Thomas (North Carolina) has worked for Panera since November 2016. (See Dkt. 36-5, Meyer Decl. ¶ 1.; Dkt. 36-6, Cornelius Decl. ¶ 1; Dkt. 36-7, Romano Decl. ¶ 1; Dkt. 36-8, Willms Decl. ¶ 1; Dkt. 36-20, Tymus Decl. ¶ 1; Higgins Decl. ¶ 6.) Thomas's employment ended in November 2017. (Dkt. 36-19, Thomas Decl. ¶ 2.) She was reclassified to an hourly-nonexempt role a year prior, on November 16, 2016. (*Id.* ¶ 7; Calaway-Habek Decl. ¶ 7; Higgins Decl. ¶ 6.)

[14] In June 2017, the JVP role was re-titled Area Operating Partner. Panera uses the JVP title herein.

[15] *See also* **Exhibit G**, Decl. of Joe Cereo in *Friscia* (Dkt. 45-10) ("Cereo/*Friscia* Decl.") ¶ 5 (expected Assistant Managers in his market "to operate like business owners, making key decisions for their cafe to ensure its success"); **Exhibit H**, Decl. of Bobby Cole in *Friscia* (Dkt. 45-11) ("Cole/*Friscia* Decl.") ¶ 9 (testifying that he was "involved in the operations of the [bakery-

which encompassed roughly 100 cafes and was led by a Regional Vice President. (Calaway-Habeck Decl. ¶ 6.)

Panera trained, expected, and compensated each salaried Assistant Manager to manage his or her cafe taking into account its unique characteristics, market factors, and personnel and other operational challenges. (*See* Lisner Decl. ¶ 5 (explaining that, as a JVP who hired Assistant Managers, he did not focus on their ability to perform hourly tasks; rather, he focused on their ability to train and coach associates and their ability to adapt to and manage change in leading the cafe); **Exhibit J**, Decl. of Dean Turner ¶ 11 ("[A]ll Assistant Managers are expected to perform managerial functions, such as writing and managing the schedule, directing and supervising the work of hourly associates, training and coaching hourly associates, addressing employee or customer issues, analyzing cafe performance, and ordering product.").)[16]

As an Assistant Manager, each Plaintiff and Opt-In was second-in-command of his or her cafe and held the only salaried-exempt role besides the GM. (Calaway-Habeck Decl. ¶ 5; **Exhibit L,** Decl. of Diana Manrique in *Friscia* (Dkt. 40-2) ("Manrique/*Friscia* Decl.") ¶ 7.) That said, the nature and extent of each Plaintiff's and Opt-In's, and indeed each Assistant Manager's, duties varied based on a variety of factors unique to each individual and his or her cafe. Accordingly, and notwithstanding Plaintiffs' unsupported suggestion to the contrary (Pls.' Mot. at 4, 6), Panera did not maintain a uniform job description for the Assistant Manager position. (Calaway-Habeck Decl. ¶ 4.) The job postings, attached as Exhibit B to Plaintiffs' Motion (Dkt. 36-4), were not intended

cafes] in [his] market only at a high level"); **Exhibit I**, Decl. of Michael Faga in *Friscia* (Dkt. 45-12) ("Faga/*Friscia* Decl.") ¶ 6 (testifying that he was not in cafe enough to supervise associates or oversee daily operations, "nor do I consider it my job to do so").

[16] *See also* **Exhibit K**, Decl. of Stefan Van Waveren in *Friscia* (Dkt. 45-9) ("Van Waveren/*Friscia* Decl.") ¶ 13 ("[W]e do not compensate an Assistant Manager … to be a cashier or a food preparer; rather, we expect them to manage.").

to, and did not, convey the job duties or requirements for the Assistant Manager role. (*Id.*) The job postings do not contain *even a partial listing* of the job duties an Assistant Manager would be expected to perform or the hours he or she might work. (*Id.*)

Given their exceptionally narrow experience, Plaintiffs and the Opt-Ins lack personal knowledge about the range of individualized circumstances faced by an Assistant Manager of any of the more than 800 cafes within the proposed collective where they did not work, much less all of them. In fact, cafes differ in myriad ways, and those differences contribute to differing day-to-day experiences for each Assistant Manager tasked with managing the cafe. Among the ways cafes differ include:

- **Location.** Even within the same market, locations varied widely, from food court locations, to city blocks, to busy highways, to residential areas. (Falkner Decl. ¶ 5; Lisner Decl. ¶¶ 7-8; **Exhibit M**, Decl. of Deanna Gallagan ¶ 3.)[17] Cafe location played a role in the types of duties an Assistant Manager performed. (Falkner Decl. ¶ 5 ("The Oxford cafe had a much busier breakfast and dinner, likely due to its proximity to the interstate. As a result, there were more associates and more peak times to manage as an Assistant Manager in Oxford.").)

- **Services.** Some cafes featured "kiosk order," "rapid pickup," drive-thru service, delivery, a mix of these services, or none at all. (Lisner Decl. ¶¶ 7-8; Gallagan Decl. ¶ 3; Turner Decl. ¶ 3.)[18] Each service presented new functionality for an Assistant Manager to understand and manage. (Lisner Decl. ¶ 8 (explaining that Assistant Manager at a cafe with a busy drive-thru must have the skills to manage both the drive-thru and the kitchen, which "can be similar to running two cafes under the same roof," while an Assistant Manager at a cafe with a robust delivery service would have to be capable of hiring quality drivers, and

---

[17] *See also Cole/Friscia* Decl. ¶ 6 (in New York market, "[t]wo cafes are stand-alone locations with drive-thru service, one is in a mall food court with no dedicated dining room, and the rest are in strip malls"); *Cereo/Friscia* Decl. ¶ 6 (similar variation in Rochester); *Van Waveren/Friscia* Decl. ¶ 3 (similar variation in Boston).

[18] *See also* **Exhibit N**, Decl. of Kristen Fodor in *Friscia* (Dkt. 45-6) ("*Fodor/Friscia* Decl.") ¶ 9 ("The Clark cafe is a freestanding location with drive-thru and delivery services."); *Van Waveren/Friscia* Decl. ¶ 3 (similar variation in Boston market); *Cereo/Friscia* Decl. ¶ 6 (similar variation in Rochester market). Many of these services began rolling out as part of the "Panera 2.0" initiative, which started at the cafes after Plaintiffs and several Opt-Ins left Panera. (*See* **Exhibit O,** Decl. of David Ostroski in *Friscia* (Dkt. 45-3) ("*Ostroski/Friscia* Decl.") ¶ 13; *Van Waveren/Friscia* Decl. ¶ 3.)

overseeing the delivery operation including a dispatcher).)

- **Hourly Staff Makeup.** Associates per cafe could range from as few as 20 to as many as 90. (Lisner Decl. ¶¶ 7, 10; Falkner Decl. ¶ 5; Gallagan Decl. ¶ 3 (noting that one cafe she oversaw employed three times more hourly associates than another cafe she oversaw).)[19] These differences impacted the day-to-day experience of each Assistant Manager, as a larger staff meant more personnel issues to manage. (*See* Gallagan Decl. ¶¶ 5-6 (explaining that an Assistant Manager as a cafe with a larger staff and higher volume of business would oversee more associates and a wider set of cafe functions than an Assistant Manager at a smaller, lower volume cafe).)[20]

- **Business Volume.** Even within a single market, cafes differed by tens of thousands of dollars in weekly revenue. (Gallagan Decl. ¶ 3 (noting that one cafe she oversaw did about $20,000 in weekly revenue while another did approximately 350% more); Falkner Decl. ¶ 5 (noting the more than $10,000 difference in weekly revenue between two cafes she managed even though the two cafes were only about 30 miles apart); *see also* **Exhibit U**, Decl. of Blair Gardner ¶ 7 (cafe initially averaged about $50,000 to $55,000 in weekly revenue); Turner Decl. ¶ 3.)

- **Variations in GM Style.** Some GMs were regularly involved in the day-to-day running of the cafe; others took a more "hands off" approach. (Lisner Decl. ¶ 11; Gallagan Decl. ¶ 4; Gardner Decl. ¶ 13; Turner Decl. ¶ 3.)[21]

    **C.**    **The Nature and Extent of Management Duties Each Assistant Manager Performed Varied from Cafe to Cafe (and Even Within the Same Cafe)**

        **1.**    **Individuals Whom Plaintiffs Identified as Similarly to Them Have Since Testified That They Primarily Performed Managerial Duties**

Despite their limited experience managing only a handful of cafes, and only for a fraction

of the relevant time, Plaintiffs purport to have knowledge of the day-to-day duties and experiences

---

[19] *See also* Cole/*Friscia* Decl. ¶ 7 (25 to 65 in New Jersey Southwest); Cereo/*Friscia* Decl. ¶ 8 (35 to 60 in Rochester); **Exhibit P**, Decl. of Irene Pia in *Friscia* (Dkt. 45-5) ("Pia/*Friscia* Decl.") ¶ 5 (30 to 90 within market).

[20] *See also* **Exhibit Q**, Decl. of Jon Bowers in *Friscia* (Dkt. 45-14) ("Bowers/*Friscia* Decl.") ¶ 3 ("[A]n Assistant Manager in a high-volume cafe is likely to spend even more time than usual coaching … and handling personnel issues"); Faga/*Friscia* Decl. ¶ 9 ("The size of a cafe's staff and number of Assistant Managers directly impact each Assistant Manager's day-to-day experience in the role.").

[21] *See also* Pia/*Friscia* Decl. ¶ 6 ("Another critical differentiator … in my market is the style of the [GM] … Some tend to spend the bulk of their shift in the [back office], while others prefer to be more visible ..."); Faga/*Friscia* Decl. ¶ 10 (comparing GM who "delegates an extraordinary amount of responsibility," while others "are more heavily involved in the day-to-day").

of Assistant Managers across the country over a four-year period. As the basis for this purported knowledge, Plaintiffs and the Opt-Ins offer alleged observations of other Assistant Managers in their respective cafes. (*See* Dkt. 36-5, Meyer Decl. ¶ 16; Dkt. 36-6, Cornelius Decl. ¶ 6; Dkt. 36-7, Romano Decl. ¶ 4; Dkt. 36-8, Willms Decl. ¶ 5; Dkt. 36-19, Thomas Decl. ¶ 18; Dkt. 36-20, Tymus Decl. ¶ 19.) In fact, Plaintiffs' and the Opt-Ins' testimony about their alleged observations of a few co-workers establishes nothing about the day-to-day duties of the limited group of Assistant Managers they may have worked with, much less the thousands more they know nothing about but nevertheless ask this Court to invite into this lawsuit.

As a threshold matter, Plaintiffs' and the Opt-Ins' alleged observations of other Assistant Managers within their cafes are devoid of the kind of detail that could credibly establish the day-to-day experiences of those they reference. Plaintiffs and the Opt-Ins fail to state whether they observed these alleged other Assistant Managers on a regular basis, whether they observed them each day and hour of their shifts, whether the other Assistant Managers worked the same or different hours, and whether they discussed with them the nature or extent of their respective involvement in specific managerial functions, such as hiring, training, coaching, disciplining, managing the schedule, delegating work, or reviewing financial performance. Rather, each one of them uses *nearly identical vague language* to make generic allegations about observing other AMs performing "the same mix of job duties."[22] Such general, unsupported allegations are insufficient

---

[22] Dkt. 36-5, Meyer Decl. ¶ 16 ("I observed other AMs … performing the **same mix of job duties** that I performed, and working over 40 hours per week."), Dkt. 36-6, Cornelius Decl. ¶ 6 ("The other AM … performed the **same mix of job duties** that I performed and often worked more than 40 hours in a workweek[.]"), Dkt. 36-7, Romano Decl. ¶ 4 ("I observed the other AM in the restaurant where I worked … performing the **same mix of job duties** that I performed and working over 40 hours per week."), Dkt. 36-8, Willms Decl. ¶ 5 ("I also observed other AMs with whom I worked … [who] performed the **same mix of job duties**[.]"),Dkt. 36-19, Thomas Decl. ¶ 18 ("I observed other AMs . . . performing the **same mix of job duties** that I performed and working

to sustain their burden of showing an illegal policy of misclassification. *See infra* Section III.C.

Next, even if Plaintiffs' and the Opt-Ins' allegations were sufficiently detailed to credibly relay the experience of the managers they claim to have observed, the observations relate to only *at most nine* cafes, which comprise barely over 1% of the 828 cafes whose managers they seek to represent. [23] (*See* Higgins Decl. ¶¶ 4-5.)

Even within this small, non-representative set, Plaintiffs and the Opt-Ins fail to present as a witness a *single* Assistant Manager they allegedly observed, including those they identify by name. In fact, three of the very Assistant Managers they specifically identify in their declarations have submitted sworn statements contradicting Plaintiffs' claims and testifying that they did not, in fact, perform the same duties or work the same number of hours as Plaintiffs claim. Whereas Plaintiffs and the Opt-Ins claim they spent most of their time and were primarily responsible for hourly tasks (*see* Dkt. 36-5, Meyer Decl. ¶ 6; Dkt. 36-6, Cornelius Decl. ¶ 7; Dkt. 36-7, Romano Decl. ¶ 5; Dkt. 36-8, Willms Decl. ¶ 6; Dkt. 36-19, Thomas Decl. ¶ 9; Dkt. 36-20, Tymus Decl. ¶ 8), the Assistant Managers whom Plaintiffs and the Opt-Ins claim they observed performing the "same mix" of duties in fact spent the bulk of their time on managerial duties, such as coaching associates and overseeing their work:

- **Angie Falkner** (identified by Opt-In Steve Willms (Dkt. 36-8, Willms Decl. ¶ 5)): Falkner testified, "I worked as an exempt Assistant Manager along with Steve Willms," and "I spent all or nearly all of my time as an exempt Assistant Manager performing managerial functions, such as writing and managing the schedule, directing and supervising the work of hourly associates, training and coaching hourly associates, addressing employee or customer issues, analyzing cafe performance, and identifying opportunities to optimize our operation.") (Falkner Decl. ¶¶ 7-9, 11). Falkner hired associates, made hiring

---

over 40 hours per week"); Dkt. 36-20, Tymus Decl. ¶ 19 ("I observed [other] AMs performing the **same mix of job duties** that I performed.") (emphases added in each).

[23] Meyer claims he "observed" managers at a second cafe where he "fill[ed] in" (presumptively when another Assistant Manager was out), but fails to identify any managers he observed. (Dkt. 36-5, Meyer Decl. ¶ 17.) Opt-In Tymus claims to have "observed" Assistant Managers at a cafe where she trained and "filled in," but names only one person. (Dkt. 36-20, Tymus Decl. ¶¶ 19-20.)

recommendations to which her GM deferred, provided feedback for performance evaluations, and participated in disciplinary and termination decisions. (*Id.* ¶¶ 7-9.)[24]

- **Warfaa Hussein** (identified by Opt-In Chelsea Romano (Dkt. 36-7, Romano Decl. ¶ 4)): Hussein testified that he worked with Romano, that he did not perform the same mix of duties she claims to have performed, and that he spent "nearly all" of his time "performing managerial functions, such as writing and managing the schedule, directing and supervising hourly associates, training and coaching associates, addressing employee or customer issues, and analyzing cafe performance." (**Exhibit C**, Decl. of Warfaa Hussein, ¶¶ 4-5, 7, 12.) Hussein specifically testified: "Romano is incorrect that I performed the same mix of job duties that she now claims to have performed. … Romano's description of her experience does not match my experience at Panera, including the Reston cafe where we both worked." (*Id.* ¶ 12.) Hussein also served as a food cost manager, meaning that, in addition to his other managerial responsibilities, he was the primary manager responsible for ordering and managing inventory. (*Id.* ¶ 8.)

- **Blair Gardner (maiden name Pate)** (identified by Opt-In Michele Thomas (Dkt. 36-19, Thomas Decl. ¶ 18)): Gardner testified that she "spent nearly all of [her] time performing managerial functions, such as directing the work of [her] associates, training and coaching them, and addressing employee issues" and that she "was the Food Cost Specialist at [her] café … [and] was the primary manager responsible for ordering and managing inventory; planning deliveries; managing inventory counts; and analyzing food metrics.) (Gardner Decl. ¶¶ 11-12.)

These Assistant Managers, who worked at Plaintiffs and the Opt-Ins' cafes, also had authority to, and did in fact, interview, hire, schedule, and evaluate associates on a regular basis (Falkner Decl. ¶¶ 7-9, 11; Hussein Decl. ¶¶ 4-8, 12; Gardner Decl. ¶¶ 14-18), functions Plaintiffs and the Opt-Ins claim they rarely or never performed. (*See* Dkt. 36-5, Meyer Decl. ¶ 15; Dkt. 36-6, Cornelius Decl. ¶ 15; Dkt. 36-7, Romano Decl. ¶ 14; Dkt. 36-8, Willms Decl. ¶ 16; Dkt. 36-19, Thomas Decl. ¶¶ 16-17; Dkt. 36-20, Tymus Decl. ¶¶ 16-18.) They also worked far fewer hours than Plaintiffs and the Opt-Ins claim to have worked. (Falkner Decl. ¶ 10 (testifying that she worked with Opt-In Willms and that: "I can say with certainty that I did not average 55 to 60 hours

---

[24] Ironically, Willms' rhapsodizing about his positive experience at Panera played a key role in Falkner's decision to leave her prior employer and join Panera as an Assistant Manager. Falkner recalls Willms "telling [her] that being a manager at Panera was like a 'utopia' and that the hours were much better." (Falkner Decl. ¶ 4.)

per week. In fact, I do not recall ever exceeding 50 hours of work in a week."); Hussein Decl. ¶¶ 6, 12 (testifying that he worked with Opt-In Romano and worked approximately 45 hours per week); Gardner Decl. ¶ 9 (testifying that she worked with Opt-In Thomas and worked on average "about 45 hours per week" with occasional higher and lower variations).

The testimony of the very peers whom they identify demonstrates that Plaintiffs and the Opt-Ins lack knowledge of the duties performed by other managers in *their own cafes*, and that their experiences in fact differed. One reason for these differences, even within a single cafe, is that an Assistant Manager focused his or her work based on, among other things, his or her individual ability, ambition, and experience, as well as the unique needs and circumstances of the particular cafe. (*See* Gallagan Decl. ¶¶ 6-7.) For example, while Assistant Managers were expected to participate in the hiring and scheduling processes, some cafes designated a specific Assistant Manager as the hiring manager or the scheduling manager, and that Assistant Manager took on a more dominant role in those areas of cafe management. (Turner Decl. ¶ 5; Hussein Decl. ¶ 8.) Others served as "Food Costs Specialists." (*See* Gardner Decl. ¶ 12.) The undeniable conclusion from these variations is that the would-be members of the proposed almost-nationwide collective are not similarly situated and that representative proof cannot be used to decide Plaintiffs' claims.

### 2. Plaintiffs' and the Opt-Ins' Declarations Are Contradicted by Their Own Prior Statements and Actions

In addition to dissimilarities among the unnamed thousands of individuals Plaintiffs seek to represent, the evidence reveals clear differences even among Plaintiffs and Opt-Ins. For example, in her online profile, Opt-In Chelsea Romano broadcasted that her job as an Assistant Manager entailed *exactly* the managerial duties she and the Opt-Ins now disclaim. Romano described her role as an Assistant Manager as comprised of important managerial functions:

**Assistant Manager**

Panera Bread  -  Reston, VA  -

August 2016 to November 2016

Certified recruitment specialist; recruited, managed and mentored an average of 40 new employees per year
• Responsible for 100+ new employee orientations, training, evaluations, and reviews
• Oversaw and managed daily operation of $2.7-million-dollar store
• Performed budgeting/cost estimates and forecasted future inventory
• Participated in food safety and regulations audit maintaining a 90% rating
• Maintained and monitored store inventory averaging $13,000 weekly
• Provided weekly/monthly operation reports to senior management

(**Exhibit D**, Decl. of Kevin Young ¶ 12 & Ex. 10.)

Similarly, according to his *Indeed.com* profile, named Plaintiff Cornelius's job duties during the period he worked as a salaried-exempt Assistant Manager included coaching a team of 50 employees, generating $3.5 million in sales, and lowering labor and food costs for his cafe. [25] (Young Decl. ¶ 11 & Ex. 9.) Thus, Romano and Cornelius concede that they performed managerial duties. In addition, Opt-In Steven Willms disciplined his employees, suspending one employee for insubordination, inappropriate behavior, and leaving the premises, and issuing a written warning to another for poor job performance. (*See* Calaway-Habeck Decl. ¶ 8 & Ex. 2.)

While Panera will contend that each Plaintiff performed varying duties sufficient to justify their exempt status, including the types of duties reflected above, the testimony of these individuals highlights the differences among Plaintiffs and the Opt-Ins and underscores the impossibility of adjudicating thousands of misclassification claims in one litigation.

### 3.   Plaintiffs Rely on Declarations From Another Lawsuit That Were

---

[25] In his *Indeed.com* profile, Cornelius holds himself out as having working as a GM for Panera since October 2013 (*see* Young Decl. ¶ 11 & Ex. 9), despite the fact that he states in his declaration that he worked as an Assistant Manager from November 2015 to approximately August 2016. (*See* Dkt. 36-6, Cornelius Decl. ¶ 1.) Panera's records show that he worked only from January 2015 until June 2015. (Higgins Decl. ¶ 6.) These discrepancies foreshadow the myriad credibility determinations and factual disputes that would cause this case to devolve into an untold number of mini-trials as to how each Plaintiff and Opt-In spent his or her time in the role.

**Undercut By the Declarants' Later Deposition Testimony**

To escape the confines of their own limited experience, Plaintiffs attempt to bolster their claims by offering publicly available declarations of Jacqueline Friscia, the sole plaintiff in *Friscia*, and Diana Manrique, Friscia's aunt, GM, and sole witness. (*See* Dkt. 36-10, Friscia Decl.; Dkt. 36-11, Manrique Decl.) Plaintiffs' faith in the declarations is misplaced, as each assertion they rely upon was, in fact, contradicted by Friscia's and Manrique's subsequent deposition testimony:[26]

| Plaintiffs' Claims | Contradictory Deposition Testimony From *Friscia* |
|---|---|
| "Panera's corporate headquarters ensures that its restaurants are all run in the same way by setting training, human resources, payroll, and other policies for all … restaurants." (Dkt. 36-1, Pls.' Mot. at 3-4 (citing Friscia Decl. ¶ 15 and Manrique Decl. ¶ 5).) | Friscia conceded she did not know whether Assistant Managers at other cafes received different training manuals or policies. (Friscia Dep. at 203:4-206:8.) <br><br> Manrique conceded she had no knowledge of whether GMs in other cafes empowered Assistant Managers to make hiring or firing decisions. (Manrique Dep. at 121:23-122:20.) She also admitted that every cafe could be set up different in terms of management. (*Id.* at 134:14-135:2.) |
| Assistant Managers had the same job duties across all locations. (Dkt. 36-1, Pls.' Mot. at 6 (citing Friscia Decl. ¶ 19; Manrique Decl. ¶ 4).) | Friscia conceded she had no personal knowledge of whether Assistant Managers at other cafes had the primary duty of performing the non-managerial work she claimed was her own primary duty. (Friscia Dep. at 211:12-212:3.) She also conceded that she did not know whether Assistant Managers at any other cafe hired or fired associates. (*Id.* at 195:24-196:19, 200:22-201:1-6.) <br><br> Manrique admitted she had no knowledge of what Assistant Managers did in cafes she never visited. (Manrique Dep. at 120:3-8.) She also admitted she could not even testify to what Assistant Managers *she supervised* did from the moment they walked in to the minute they left the cafe. (*Id.* at 123:2-17.) <br><br> Both Friscia and Manrique conceded they had no idea how the Assistant Manager role changed after they left the Company in 2014. (Friscia Dep. at 63:23-64:2; Manrique Dep. at 38:24-39:8.) |

---

[26] Cited excerpts from the depositions of Friscia and Manrique are attached as Exs. 11 and 12 to the Young Decl. (**Exhibit D** hereto).

| Plaintiffs' Claims | Contradictory Deposition Testimony From *Friscia* |
|---|---|
| Plaintiffs' primary job duties included tasks such as "greeting customers, preparing and delivering food and drinks, washing dishes, cleaning," but did not involve management tasks such as hiring, firing, disciplining, or promoting. (Dkt. 36-1, Pls.' Mot. at 6-7 (citing Friscia Decl. ¶¶ 5, 19 and Manrique Decl. ¶¶ 4, 6).) | Friscia admitted she was in charge of her entire cafe when she was on shift. (Friscia Dep. at 81:16-23.) She also conceded that she: (i) evaluated associates (*id.* at 92:24-93:3); (ii) delegated work to associates (*id.* at 151:25-152:13); (iii) trained and coached associates (*id.* at 170:25-171:7, 177:4-15); (iv) had authority to write up associates (*id.* at 94:8-19); (v) had authority to initiate discipline that led to termination (*id.* at 95:10-13); and (vi) was responsible for ensuring safety (*id.* at 131:22-25).<br><br>Likewise, Manrique testified that Assistant Managers: (i) had authority to discipline associates, which could lead to termination (Manrique Dep. at 63:12-64:17); (ii) made decisions about how to coach associates (*id.* at 68:25-69:9); (iii) were responsible for ensuring cafe safety (*id.* at 85:6-13); (iv) had authority to fire associates without consulting HR in certain situations (*id.* at 95:17-24); and (v) evaluated associates (*id.* at 119:4-6). |
| "Plaintiffs also observed other AMs work over 40 hours in a workweek." (Dkt. 11-1, Pls.' Mot. at 5-6 (citing Friscia Decl. ¶¶ 18-20).) | Friscia admitted that she could not testify that she knew what Assistant Managers in other cafes did throughout the day based on the limited amount of time she spent at other cafes. (Friscia Dep. at 51:24-54:2; 56:22-25.) |

Friscia and her aunt's deposition testimony make clear that their declarations, on which Plaintiffs expressly rely, are inaccurate (at best). They do nothing to bolster Plaintiffs' claims other than underscore the probing for credibility and accuracy that each Plaintiff will necessarily undergo during discovery to assess the merits of his or her claim if a collective is certified.

### 4.     The U.S. DOL Investigated Multiple Panera Cafes and Determined That Assistant Managers Were Correctly Classified as Exempt

Plaintiffs claim that all salaried-exempt Assistant Managers who worked at any Panera cafe across the country were misclassified. (Dkt. 36-1, Pls.' Mot. at 1.) Yet the Wage and Hour Division of the U.S. DOL has conducted audits of multiple cafes within the scope of the proposed collective. Not only has the DOL never found the position to be misclassified, but it has repeatedly found that Panera properly classified Assistant Managers at the particular cafes it audited. (Young Decl. ¶ 9.)

More specifically, the DOL has explicitly opined that Assistant Managers were properly classified as exempt at cafes where the DOL conducted audits in: Sioux Falls, SD; Schereville, IN; Olympia, WA; and Buffalo, NY.[27] Three of the cafes in which DOL determined an exemption applied to Assistant Managers thus are encompassed within the geographic scope of Plaintiffs' proposed collective (about which Plaintiffs profess knowledge). These findings confirm the exempt status of individual Assistant Managers among those whom Plaintiffs wish to represent; their DOL-determined exempt duties would necessarily contrast with those of any Assistant Manager whose duties are allegedly nonexempt, again confirming the need for individual examination of each Assistant Manager's claim and making collective treatment improper.

### D.      Assistant Manager Training Was Management-Focused and Individualized

Whether out of confusion or an attempt to obfuscate, Plaintiffs assert that Assistant Manager training focused primarily on hourly-associate-type tasks, and they intimate that such training was uniform across the Company. (*See, e.g.*, Dkt. 36-1, Pls.' Mot. at 3, 7; Dkt. 36-6, Cornelius Decl. ¶¶ 3-4 (alleging that he only learned how to perform managerial duties in last two weeks of eight-week training course); Dkt. 36-8, Willms Decl. ¶¶ 2-3 (alleging he spent 90-95% of time in a six-week training course learning how to perform tasks performed by hourly employees); Dkt. 36-5, Meyer Decl. ¶ 19 (suggesting training was uniform because he is not aware of any additional training Assistant Managers underwent before working in another cafe).) These alleged experiences are wholly inconsistent with Panera's practices and the experiences of other Assistant Managers. Plaintiffs' suggestion that training promoted a "glorified associate" view of

---

[27] Young Decl. ¶¶ 3-6, Ex. 2 (Compl. Action Rpt., Case ID: 1597759), Ex. 3 (Compl. Action Rpt., Case ID: 1282062), Ex. 4 (Compl. Action Rpt., Case ID: 1541116), Ex. 5 (Compl. Action Rpt., Case ID: 1792155). The DOL also opined that it found no overtime violations at cafes located in Glenmon and Buffalo, NY. *Id.* ¶¶ 7-8, Ex. 6 (Compl. Action Rpt., Case ID: 1581757), Ex. 7 (WHISARD Compliance Action Rpt., Case ID: 1705403).

the role, if taken as true, only magnifies how different they are from those who recount a far different story.

As an initial matter, each Assistant Manager did not receive the same training. Those who were new to the Company typically began with a three-week prelude to the Manager In Training ("MIT") program in a training cafe in their market, where they focused on core tasks required of the associates they would manage and supervise at their home cafes within that particular market. (Falkner Decl. ¶ 13; Turner Decl. ¶ 13; Gardner Decl. ¶¶ 5-6; *see also* Bowers/*Friscia* Decl. ¶ 6.) The purpose of this training, for those who received it, was to equip each new manager to effectively manage and coach his or her associates in performing those tasks. (*Id.*) MIT training is focused on managerial duties; it counsels against locking into associate-level work to the detriment of management responsibilities and provides techniques for doing so, such as delegating any hourly-type task that will take more than 60 seconds to complete. (Falkner Decl. ¶¶ 13-15; Turner Decl. ¶ 12; Hussein Decl. ¶ 11; *see also* **Exhibit R**, Decl. of Jonathan Bascones in *Friscia* (Dkt. 45-7) ("Bascones/*Friscia* Decl.") ¶ 11; **Exhibit S**, Decl. of Conrad Picou in *Friscia* (Dkt. 45-15) ("Picou/*Friscia* Decl.") ¶ 11.)

Assistant Managers also received training opportunities in their home cafe after completing MIT, both through formal training and informal coaching. (Falkner Decl. ¶ 14; Hussein Decl. ¶ 10; *see also* Bowers/*Friscia* Decl. ¶ 6.) For instance, some Assistant Managers participated in AMSP, a set of specialized management courses in operational and supervisory functions such as food cost control, employee training, facilities management, and service management. (Falkner Decl. ¶ 14; Hussein Decl. ¶ 10; *see also* Cereo/*Friscia* Decl. ¶ 16.) Whether to take AMSP courses, and if so which ones, was an individualized decision made by each Assistant Manager, sometimes in conjunction with his or her GM. (Falkner Decl. ¶ 14; Hussein Decl. ¶ 10; *see also* Van

Waveren/*Friscia* Decl. ¶ 10; Faga/*Friscia* Decl. ¶ 18; Bowers/*Friscia* Decl. ¶ 6; Cereo/*Friscia*

Decl. ¶ 17.) This is but one reason why Assistant Manager training was inherently individualized.

In addition, an Assistant Manager who transferred to a new cafe sometimes received

additional training to prepare him for the needs of the cafe. (*See* Lisner Decl. ¶ 9 (describing

training administered to an Assistant Manager who recently transferred to a new cafe and had to

learn to manage the delivery operation and other features unique to the new cafe, and explaining

that "[i]n light of the fact that cafes vary materially, it is not uncommon for an Assistant Manager

who transfers between markets or cafes to receive additional training").)

### E. Almost 76% of the Assistant Managers Plaintiffs Purport to Include in This Lawsuit Are Subject to Binding Arbitration Agreements

On June 3, 2016, Panera implemented an arbitration program. (Calaway-Habeck Decl. ¶ 9

& Ex. 3.[28]) The program encompasses Assistant Managers and other cafe employees employed by

the Company at that time. (*Id.*) Of the 3,015 salaried-exempt Assistant Managers Plaintiffs purport

to represent, 2,283—or 75.7%—were employed in cafe-level positions at the time the program

was implemented. (Higgins Decl. ¶¶ 4-5.) Those individuals are presumptively covered by the

agreement, which provides for mandatory arbitration of various types of claims on an individual

basis, including claims seeking alleged unpaid overtime. (Calaway-Habek Decl. ¶ 9 & Ex. 3.)

The Supreme Court's decision in *Epic Systems* removed any cloud of doubt regarding the

enforceability of individual arbitration agreements containing a waiver of the right to participate

in class or collective litigation, such as the one to which some 76% of the requested collective here

are bound. In light of the Supreme Court's resounding endorsement of parties' right under the

---

[28] Plaintiffs disingenuously state that Panera has not produced any signed arbitration agreement, suggesting that this removes the issue from relevance to the conditional certification analysis. (Dkt. 36-1, Pls' Mot. at 18 n.7.) The Federal Arbitration Act requires only that arbitration agreements to be in writing. 9 U.S.C. § 2.

Federal Arbitration Act to agree to utilize the relative simplicity and speed of individual arbitration, certifying a nationwide collective including individuals bound to arbitrate means, without fail, that litigation of their claims will entail not only protracted examination of Panera's unique defenses to each such individuals' claims but also, conversely, Plaintiffs' inevitable arguments regarding the enforceability of the agreement on an individual-by-individual basis. (*See* Pls.' Mot. at 19 ("the obligation to arbitrate requires factual development").) Such examination is likely to include probing by Plaintiffs of the circumstances surrounding dissemination and receipt of the agreement, any other communications sent or received about the agreement, and any special circumstances that might influence the agreement's enforceability (to the extent permissible under *Epic* and the Federal Arbitration Act's "savings clause," 9 U.S.C. § 2). The individual determinations and unique defenses that will be required for each Assistant Manager who opts-in and is bound by the arbitration agreement, will disserve, rather than advance, judicial efficiency and certification therefore should be denied. *See infra* Section IV.E.

### F. The Collective Conditionally Certified in *Covelli Enterprises* Involves a Different Employer, a Different Circuit's Law, and Different Evidence

In the absence of evidence supporting their bid for nationwide certification, Plaintiffs rely heavily on the fact that a court in Ohio applying Sixth Circuit precedent in a case involving a different defendant recently conditionally certified a collective of managers who worked for franchise locations. (*See* Dkt. 36-1 at 1, 13, 16-17.) Plaintiffs' representation that the Ohio case, *Kis/Romano v. Covelli Enterprises, Inc.*, Case No. 18-cv-0054 (N.D. Ohio), is "nearly identical" to this case strains credibility. First, the defendant in that action, Covelli Enterprises, is an entirely distinct entity from Panera, LLC that provides services to franchisees that operate Panera Bread Company cafes (and other restaurant brands).[29] (*See* Young Decl. Ex. 13 (Def.'s Opp. Br. in

---

[29] Contrary to Plaintiffs' assertion, Covelli Enterprises disputed that it is "one of Panera's largest

*Kis/Romano*, at 3-5.) The allegations in that case reveal nothing about duties performed by Assistant Managers in company-owned cafes operated by the defendant in this case, Panera, LLC. There is no basis, as a matter of fact or law, to impute any actions, decisions, or policies of Covelli to Panera with respect to Panera's operation of company-owned cafes.

Second, Plaintiffs ask this Court to take a bridge too far when they argue that the fact that Opt-In Romano allegedly was "not required to undergo any additional training" when she moved from a Covelli-affiliated location in Virginia to a cafe owned and operated by Panera demonstrates an unlawful, and claim-unifying, nationwide policy. (Pls.' Mot. at 16.) At most, this claim relates to the particular cafe and circumstances in Virginia where Romano worked for a few months.

Third, the plaintiffs in *Kis/Romano* based their conditional certification request on evidence not presented here, including a document captioned "Job Description"—which, notably, describes exempt duties—not to mention the law of a different circuit.

## IV.    ARGUMENT AND ANALYSIS

Plaintiffs' evidence falls well short of the evidentiary showing required to warrant conditional certification of a collective spanning thousands of individuals who worked in over 800 Panera locations in nearly every state. What little testimony supported by personal knowledge Plaintiffs have offered provides no basis for concluding that common evidence will provide a common answer to the question whether all salaried-exempt Assistant Managers performed primarily exempt job duties over the requested multi-year period. There is no *unlawful* policy

---

franchisees," as opposed to a management services company. Covelli further contested the conclusion that it may be a joint employer (together with the relevant franchisees) of assistant managers in cafes for which it provides services. (Young Decl. Ex. 13 at 3-5.) The ruling granting conditional certification expressly anticipates discovery regarding the joint employer issue and notes that Covelli may seek decertification based on evidence refuting joint employer status. (Pls.' Mot. Ex. P (Dkt. 36-18) at 2-3.) Any motion to decertify following post-conditional certification discovery is due to be filed in *Kis/Romano* by August 12, 2018. (*Id.* at 5.)

uniting the proposed collective and permitting resolution through common proof. Only in "*appropriate cases*" should this Court exercise its discretion to facilitate an opt-in notice process and permit an FLSA claim[30] to proceed on a collective basis notwithstanding the extraordinary burdens that such proceedings can cause the parties and the courts. *Hoffmann-LaRoche, Inc. v. Sperling, Inc.*, 493 U.S. 165, 169 (1989) (emphasis added). This is not such an appropriate case.

## A.   Where Some Discovery Has Been Completed, a Higher Standard Applies

While arguing that this Court should apply the most lenient standard to their request for conditional certification (*see* Pls.' Mot. at 10-11), Plaintiffs simultaneously rely on evidence from *Friscia*, a case in which the parties have completed fact discovery.[31] Many courts "have reasoned that the degree of scrutiny applied should increase in proportion to the discovery that has been conducted." *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 481-82 (S.D.N.Y. 2016) (collecting cases) (applying "a modest 'plus'" standard under which the court looked beyond the pleadings and affidavits submitted by the plaintiffs and considered the evidence submitted by both parties, and finding that the plaintiffs' evidence was insufficient to warrant conditional certification of a nationwide collective consisting of thousands of workers at over 70 different worksites).

This Court should apply a stricter certification standard in this case. Plaintiffs should not be permitted to draw extensively on the fruits of discovery in *Friscia* while simultaneously benefiting from a lower level of scrutiny intended for cases where neither party has had the benefit of discovery. *See Sloane v. Gulf Interstate Field Servs.*, 2017 WL 1105236, at *7 (M.D. Pa. Mar.

---

[30] As noted above, Plaintiffs also bring collective claims under the D.C. Minimum Wage Act ("DCMWA"), D.C. Code §§ 32-1001, *et seq.* Plaintiffs explain that the DCMWA's collective action provision incorporates the FLSA's collective action mechanism. (Dkt. 36-1, Pls.' Mot. at 20-21.) Thus, Panera's arguments apply equally to the requested collective claim under that statute, and certification of a collective under the DCMWA should be denied.

[31] *See Friscia*, No. 16-cv-03754 (D.N.J.), Dkt. 50 (extending fact discovery until Feb. 28, 2018).

24, 2017) (applying intermediate standard where "substantial but not all discovery" had taken place in a related, previously-filed case involving the same claims by same type of employees) (internal citation omitted); *see also Basco v. Wal-Mart Stores, Inc.,* No. 00-3184, 2004 WL 1497709 at *5 (E.D. La. July 2, 2004) ("To create a collective action class, including the cost associated with that, when a Court is convinced that there is insufficient support for the same prior to certification would be an exercise in futility and wasted resources for all parties involved.") (combining first and second stages of certification inquiry and *considering disparate employment settings, unique defenses, and procedural/fairness issues* in denying certification of off-the-clock and other claims where substantial discovery had been completed).

Moreover, this Court can and should consider Plaintiffs' evidence "in light of the evidence submitted by [d]efendant[]." *Holley v. Erickson Living*, 2012 WL 1835738, at *4 n.4 (E.D. Pa. 2012) (citing *Bramble v. Wal-Mart Stores, Inc.*, 2011 WL 1389510, at *5 n.6 (E.D. Pa. 2011)); *McKnight v. Honeywell Safety Prods. USA, Inc.,* 2017 WL 3447894, at *7 (D.R.I. 2017) ("In considering a stage-one, conditional certification motion, courts accept and consider the unverified allegations in the complaint, as well as sworn statements, affidavits and declarations from *both the employees and the employer*") (emphasis supplied).

Irrespective of which standard this Court applies, Plaintiffs fail to carry their burden. They cannot circumvent the fact that the collective action litigation they propose would be unmanageable and inefficient. Plaintiffs and the Opt-Ins have not shown that they are "similarly situated" to anyone—certainly not the thousands of Assistant Managers across the country with whom they never worked or interacted, and not even with respect to one another or the handful of Assistant Managers with whom they briefly worked.

**B.      The Evidence and the Nature of Plaintiffs' Claims Shows that Collective Litigation Would Be Unmanageable and Inefficient**

Furthermore, even at the first, so-called "relatively lenient" conditional certification stage—and particularly in light of the evidence of dissimilarity that Panera has offered—this Court is not required to wear blinders in exercising its discretion whether to certify a nationwide collective. Rather, this Court can and should consider whether certification will serve a purpose other than to provide settlement leverage to Plaintiffs and their counsel where the record shows that collective litigation would devolve into a series of mini-trials on enforcement of arbitration agreements and on whether each remaining plaintiff's duties satisfy an FLSA exemption.

For example, in *Dinkel v. MedStar Health, Inc.,* 880 F. Supp. 2d 49, 53 (D.D.C. 2012), the Court refused to certify a requested a meal break collective of more than 4,000 hourly employees working in some 200 departments across nine hospitals where the plaintiffs worked in only *two departments* at *one* hospital. Citing concerns with both the plaintiffs' barebones factual showing and with manageability of the proposed collective, the court first reasoned that, aside from testimony about potentially questionable meal break practices within the two departments where they worked, plaintiffs offered only evidence of a meal period auto-deduct policy which—like Panera's (former) exempt classification of Assistant Managers—"is not by itself the least bit unlawful." *Id.* at 55. In other words, the court in *Dinkel* carefully considered whether the plaintiffs had offered personal knowledge of unlawful practices across all of the locations they sought to include in their collective and, as here, concluded that they had not.

Furthermore, the *Dinkel* court reasoned, cases like the Supreme Court's Rule 23 decision in *Wal-Mart v. Dukes,* 131 S. Ct. 2541 (2011), should be applied to constrain conditional certification where manageability and efficiency concerns are present. As here, in *Dinkel* there was no unlawful written policy and resolution of the litigation would turn on allegedly unlawful

practices carried out by individual managers. Even at the "early stage of proceedings," the court

reasoned, "the Court cannot turn a blind eye to the fact that such a practice will ultimately turn on

the way in which individual supervisors and managers exercised their discretion" with respect to

the challenged meal break practice. *Id.* at 57 (citing *Dukes* and expressing doubt that there existed,

on the claims presented, "a workable across-the-board approach for such a determination" and

concluding that it would "be left to make individualized determinations for each party-plaintiff").[32]

### C.   Plaintiffs Fail to Prove That They and Members of the Proposed Nationwide Collective Are "Similarly Situated" With Respect to Job Duties

Even the more lenient standard Plaintiffs advocate is "not invisible." *Purdham v. Fairfax*

*Cty. Pub. Schs.,* 629 F. Supp. 2d 544, 548 (E.D. Va. 2009) (internal quotations omitted); *see also*

*Rowe v. Hosp. Housekeeping Sys., LLC,* 2018 WL 733228, at *3 (E.D. La. 2018) (denying

conditional certification where complaint and two declarations failed to provide sufficient facts to

bind plaintiff and opt-ins to larger proposed collective and noting that "[a]lthough the standard for

conditional certification is lenient, it is not automatic, and it is not toothless"); *Harriel v. Wal-Mart*

*Stores, Inc.,* 2012 WL 2878078, at *4 (D.N.J. 2012) ("Certification at the notice stage, though

governed by a lenient standard, is not automatic.") (internal citation omitted).

Plaintiffs must establish that this is an appropriate case for conditional certification by

making a *factual* showing that the thousands of strangers they wish to invite into this litigation are

sufficiently similarly situated to create efficiencies through collective treatment of their claims.

*Symczyk v. Genesis HealthCare Corp.,* 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds,*

---

[32] *See also, e.g., Syrja v. Westat, Inc.,* 756 F. Supp. 2d 682, 686 (D. Md. 2010) ("[w]hen sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, ... a court can ... deny certification outright"; "a court may determine that conditional certification is inappropriate where multiple claims cannot be adjudicated efficiently because they would require "substantial individualized determinations for each class member") (internal citations omitted).

569 U.S. 66 (2013) (factual showing requires "some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees"). "Ultimately, plaintiffs must "'demonstrate a nationwide policy pursuant to which [Assistant Managers] are assigned duties that render [Panera's] exempt classification inappropriate.'" *McKnight* 2017 WL 3447894, at *7 (internal citation omitted).[33]

In alleged misclassification cases such as this, courts have refused to conditionally certify FLSA collective claims when the evidence does not establish the similarity of *actual* job duties and work experiences. In *Brown v. Barnes & Noble, Inc.,* 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017), for instance, the court denied conditional certification of a nationwide collective of bookstore café managers on evidence similar to that presented here: classification of the at-issue position as exempt, later reclassification as non-exempt, a small number of declarations, and a uniform job description (not present here). *See also McKnight*, 2017 WL 3447894 at *9 ("[Defendant]'s classification of buyers as exempt, standing alone, is insufficient to satisfy the lenient standard for certification."); *In re Morgan Stanley Smith Barney LLC*, 2016 WL 1407743, at *8 (D.N.J. Apr. 11, 2016) ("Plaintiffs argue that they have met this fairly lenient standard simply because MSSB has a uniform policy of treating all FAs as exempt under the FLSA. However, in light of the substantial evidence on the record, it is apparent that those policies affect different FAs in vastly different ways."); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800 (S.D.N.Y.

---

[33] *See also, e.g.*, *Purdham,* 629 F. Supp. 2d at 547-48 ("[C]ourts should not exercise their discretion to facilitate notice unless '[t]he facts and the circumstances of the case illustrate' that a class of 'similarly situated' aggrieved employees exists." (quoting *Hoffmann,* 493 U.S. at 170))*; Dreyer v. Altchem Envtl. Servs., Inc.,* 2007 WL 7186177, at *3 (D.N.J. 2007) ("In spite of the modest evidentiary standard, courts have not hesitated to deny conditional certification when evidence is lacking.").

2012) (refusing to conditionally certify a nationwide collective based on six assistant managers' assertions that the employer had "a uniform expectation of the ASMs' duties and responsibilities that applies to all stores nationwide … and that [the named plaintiff] and five other ASMs routinely performed nonexempt duties); *Bramble*, 2011 WL 1389510 at *2, 8 ("Although plaintiffs and the putative opt-ins share the same … title and essentially the same job description, an analysis of plaintiffs' claim … would require an individualized inquiry as to whether the tasks in fact performed by each … were similar to the tasks that plaintiffs claim they performed[.]"). As detailed below, Plaintiffs' evidence falls short of the mark.

> **D.**     **Plaintiffs' Evidence Does Not Establish Similarity Between Their Duties and the Duties of the More Than 3,000 Individuals They Seek to Represent**

Plaintiffs ground their request for conditional certification on their own self-serving declarations, superficial indicators of uniformity at the corporate level, unsupported declarations of two individuals in another case, and a certification decision involving a different employer— none of which, standing alone or viewed together, provides a legally sufficient basis for certifying a nearly nationwide collective spanning several years and encompassing thousands of individuals.

> **1.**     **Plaintiffs' Testimony Fails to Establish That They Are "Similarly Situated" to Each Other or the Putative Collective Members**

This Court has never conditionally certified a collective spanning 46 states (including D.C.), more than 800 locations, and encompassing some 3,000 employees based on the type of limited evidence offered by Plaintiffs. Indeed, the cases cited by Plaintiffs rebut the argument that their evidence supports conditional certification of a collective of the scope and size they propose. (*See* Dkt. 36-1, Pls.' Mot. at 14, 18-20.) In those cases, the plaintiffs generally sought, and the courts only certified, collectives that were far more limited.[34] For instance, in *Cryer v.*

---

[34] *See Freeman v. MedStar Health Inc.,* 187 F. Supp. 3d 19 (D.D.C. 2016) (limiting collective to between 26 and 50 employees who worked in nine departments in three hospitals, and excluding

*Intersolutions, Inc.*, 2007 WL 1053214 (D.D.C. 2007), a case on which Plaintiffs heavily rely that did not involve misclassification allegations, the certified collective was limited to D.C. and three states and involved no more than 400 employees.

Plaintiffs' and the Opt-Ins' six cookie-cutter declaration are fatally deficient because of their vagueness and lack of specificity. As detailed above, Plaintiffs and the Opt-Ins uniformly fail to: (i) elaborate on the timing, setting, or frequency of the alleged observations they made of other Assistant Managers in their respective cafes; (ii) present testimony of a *single* Assistant Manager identified by name whom they claim to have observed—despite months in which to do so; or (iii) provide any level of detail about what, exactly, they observed with respect to the actual day-to-day duties of each Assistant Manager. In short, Plaintiffs establish *nothing* about the daily duties that other Assistant Managers carried out at their respective cafes, which would be at the heart of this litigation given their allegations and Panera's defenses. Courts have repeatedly found such deficiencies in declarations fatal to a conditional certification motion. As one court recently

---

another three hospitals because the court had previously granted summary judgment to the employer with respect to the named plaintiffs representing the excluded hospitals); *Rivera v. Power Design, Inc.*, 172 F. Supp. 3d 321 (D.D.C. 2016) (certifying collective limited to D.C. where there were five named plaintiffs); *Eley v. Stadium Grp., LLC*, 2015 WL 5611331 (D.D.C. 2015) (certifying collective of employees who worked at a single night club in the District of Columbia where eight named plaintiffs from the club initiated the lawsuit); *Ayala v. Tito Contractors*, 12 F. Supp. 3d 167 (D.D.C. 2014) (certifying a collective of approximately 100 individuals limited to D.C., Maryland, and Virginia where there were seven named plaintiffs and 16 additional opt-in plaintiffs); *Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88 (D.D.C. 2013) (certifying a collective of less than 300 individuals limited to D.C. where there were four named plaintiffs); *Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3 (D.D.C. 2010) (granting unopposed motion for conditional certification and class certification of employees in Maryland and D.C.); *McKinney v. United Stor-All Ctrs., Inc.*, 585 F. Supp. 2d 6 (D.D.C. 2008) (certifying collective limited to D.C., Northern Virginia, and Maryland); *Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440 (D.D.C. 2007) (certifying a collective limited to D.C. where there were two named plaintiffs); *Chase v. AIMCO Props., LP*, 374 F. Supp. 2d 196 (D.D.C. 2005) (certifying a nationwide collective only after parties engaged in extensive discovery and there were nine named plaintiffs who worked in four states and *46 additional opt-in plaintiffs*).

reasoned in denying certification of a nationwide class of bookstore café managers:

> This Court cannot infer that Defendant had a *de facto* policy of requiring all 1,100 CMs to perform non-exempt work based only on the personal experiences of the nine people who have joined this suit. Nor can it infer such a policy from general assertions in Plaintiffs' declarations. The Court notes that in some of the Plaintiffs' cookie-cutter declarations, they assert that they are aware of other CMs who primarily performed non-exempt duties because of their observations and discussions with other CMs. Plaintiffs, however, fail to provide any details about these observations or conversations, including when they occurred, how often they occurred, or the sum and substance of what was discussed or observed. Thus, these references to others do not support Plaintiffs' contention that they are similarly situated to other CMs nationwide.

*Brown v. Barnes & Noble, Inc.,* 252 F. Supp. 3d at 266.[35]

Furthermore, as detailed above, contrary to Plaintiffs' vague allegations, the record evidence confirms that Assistant Managers—including Assistant Managers identified by Plaintiffs and Opt-Ins as victims of the same alleged misclassification—performed a range of specifically enumerated managerial duties which distinguish their experiences from Plaintiffs' and the Opt-Ins' experience[36] "[C]ourts should take note of sworn statements from other employees in the proposed collective that contradict those of the named plaintiffs, particularly if the named plaintiffs lack personal knowledge of practices in other areas of the business." *McKnight,* 2017 WL 3447894

---

[35] *Accord Hughes v. Twp. of Franklin,* 2014 WL 1428609, at *2 (D.N.J. 2014) ("Unsubstantiated, general, and vague assertions of widespread violations or 'terse declarations' fail to establish the requisite 'modest' factual showing."); *Bouthner v. Cleveland Constr., Inc.,* 2012 WL 738578, at *5 (D. Md. 2012) (holding that declarations containing "'meager factual support' are insufficient to support conditional certification" based on purported misclassification); *Beecher v. Steak N Shake Operations, Inc.,* 904 F. Supp. 2d 1289, 1294 (N.D. Ga. 2012) (denying conditional certification where the plaintiffs proffered "declarations replete with 'cookie-cutter' statements void of specificity"); *Holesapple v. E-Mortg. Mgmt., LLC,* 2011 WL 6887684, at *6 (D.N.J. 2011) (finding plaintiff's declaration "more notable … for what it fails to say," e.g., failing to identify similarly situated individuals, and continuing: "These vague, non-specific, and conclusory allegations from a person presumably in a position to know fail to establish the required factual nexus even applying a lenient standard.").

[36] These are not declarations from so-called "happy campers" that Panera unilaterally selected. The witnesses are one that *Plaintiffs and the Opt-Ins* identified by name as allegedly performing the same mix of claimed non-exempt duties.

at *8 (noting that "when the employer makes a robust factual presentation that there is no widespread FLSA violation, the court should not ignore it" and "such proof heightens the court's responsibility to assure that there is some factual basis for plaintiffs' claim of class-wide impact before conditional certification should be granted"). Here, the testimony of Plaintiffs' and the Opt-Ins' co-Assistant Managers reflects that they in fact spent the majority of their time managing their respective cafes; they interviewed and participated in hiring hourly associates, disciplined associates, wrote schedules, coached associates, directed associates' work, and analyzed cafe performance. (Falkner Decl. ¶¶ 7-9, 11; Hussein Decl. ¶¶ 4-5, 7, 12; Gardner Decl. ¶¶ 10-11, 14-18; *see also* Gallagan Decl. ¶¶ 2, 8-9 (explaining that in her experience, which included the oversight of dozens of cafes in Minnesota, Michigan, and Ohio, "Assistant Managers are key players in the hiring process" who commonly "decide which job candidates to bring in for an interview; and/or decide whether to hire a candidate" because "[h]iring is part of their job," and "Assistant Managers have authority to counsel and discipline associates, and, when they deem it necessary, to pursue termination").)

Even if Assistant Managers identified by Plaintiffs and the Opt-Ins had not contradicted core allegations in Plaintiffs' and the Opt-Ins' declarations, their declarations would still be wholly insufficient to support the vast collective Plaintiffs seek. As explained above, based on their own testimony, Plaintiffs/Opt-Ins interacted with Assistant Managers from no more than nine cafes in only five of the 46 relevant jurisdictions. None of their alleged observations were of Assistant Managers from the other states or the other 800+ cafes they claim to represent.[37] (*See* Higgins

---

[37] Also, for substantial periods of time within the requested certification period, Plaintiffs presented no testimony, or testimony limited to a state or two. *See supra* at 8-9  n.11. Plaintiffs' purported knowledge about other Assistant Managers' job duties is further limited by the fact that none of them other than Thomas worked for Panera as an Assistant Manager after November 2016. To the extent Plaintiffs seek to include persons who worked only as hourly-nonexempt Assistant

Decl. ¶ 5.) *See Ahmed v. T.J. Maxx Corp.*, 2014 WL 5280423, at *8 (E.D.N.Y. 2014) (denying conditional certification and explaining that while the statements opt-in plaintiffs employed in Pennsylvania, Alabama and New York "describe working conditions that provide some support for [the named plaintiff]'s application, those submissions are simply insufficient to establish a factual nexus between [the named plaintiff] and the thousands of ASMs working in more than 4000 stores nationwide"), *aff'd*, 103 F. Supp. 3d 343 (E.D.N.Y. 2015); *Reed v. Empire Auto Parts, Inc.*, 2015 WL 761894, at *7 (D.N.J. 2015) (denying conditional certification and explaining that court would not draw "extremely attenuated inference[s]" where plaintiff lacks sufficient knowledge of other employees and relies on assumed facts); *Brown,* 252 F. Supp. 3d at 266.

> **2.      Other Lawsuits Challenging Assistant Managers' Exempt Classification Do Not Establish That Plaintiffs Are "Similarly Situated" to Each Other or the Putative Collective Members**

For reasons detailed in Section III.F. above, the certification decision in *Kis/Romano v. Covelli Enterprises* has no bearing on the resolution of Plaintiffs' Motion. Likewise, Plaintiffs' reliance on the declarations of Friscia and Manrique from the *Friscia* litigation, which relates to New York, New Jersey, and Massachusetts—states not at issue here—cannot salvage their limited knowledge. *See supra* Section III.C.3. Plaintiffs rely on Friscia and Manrique's declarations to support their claims that all Assistant Managers performed the same non-managerial duties and that all Assistant Managers regularly worked overtime hours. Yet, as detailed above, these declarants' own deposition testimony directly contradicts Plaintiffs' allegations. Indeed, Friscia admitted that she had limited knowledge of other Assistant Managers *in her own cafe.* (Young Decl. Ex. 11 (Friscia Dep.) at 131:12-14).) Manrique subsequently confirmed that Friscia's alleged

---

Managers after the reclassification in November 2016, they have offered testimony from only one person and one state.

experience was dissimilar from other Assistant Managers in the Woodbridge cafe where they both worked, testifying that other Assistant Managers at the cafe interviewed candidates, and Manrique, as the GM, took their hiring recommendations seriously. (Young Decl., Ex. 12 (Manrique Dep.) at 42:24-43:7, 55:9-56:7).) To be clear, while this testimony certainly calls into question the merits of Plaintiffs' claims, its import at this stage is that it *highlights dissimilarity among Plaintiffs' and the Opt-Ins' alleged work experiences* and the experiences of Friscia, a witness they hold up as an example of a similarly situated employee.

*Friscia* is not the only lawsuit Plaintiffs attempt to use to bolster their claims. Plaintiffs argue that this Court should infer that other similarly situated individuals exist simply because Panera has faced three other lawsuits (two dating from 2010 and one from 2012) involving alleged misclassification. (*See* Dkt. 36-1, Pls.' Mot. at 17.) As Plaintiffs acknowledge, none of these lawsuits reached the conditional certification stage, much less the merits of the case. (*Id.*) They encompassed a different time period than that at issue in this lawsuit. Furthermore, the two cases Plaintiffs cite in support of their argument that the mere filing of similar lawsuits against Panera demonstrates that similarly situated employees exist, do not compel that conclusion. In one, the court's analysis did not turn on the fact that a similar lawsuit had been filed; rather, it examined deposition testimony from the other case that was relevant to the plaintiffs' specific factual allegations regarding uncompensated off-the-clock work. *See Mendoza v. Casa de Cambio Delgado, Inc.*, 2008 WL 3399067, at *2 (S.D.N.Y. 2008) ("In addition to the affidavits, Plaintiffs have provided the deposition transcripts of nine other Delgado employees" from depositions "taken in connection with a prior lawsuit in which the Delgado companies were also the defendants"). In the other, the court conditionally certified a collective of employees who worked at a *single grocery store location* based on declarations from eight employees at that location and

evidence of previous litigation by hourly employees *at the same location. See Alvirde v. Fresh Farms Int'l Mkt., Inc.*, 2014 WL 7265072, at *2 n.2 (N.D. Ill. 2014).

Moreover, courts have repeatedly rejected attempts by plaintiffs to use the mere filing of similar lawsuits to meet the evidentiary standard for conditional certification. *See, e.g.*, *Becerra v. IM LLC-I*, 2016 WL 8968978, at *5 (E.D.N.Y. 2016) (denying conditional certification and affirming magistrate judge's finding that "complaints filed by employees in other actions were not probative for purposes of a motion for conditional certification in this action"); *Walker v. Jefferson Cty. Bd. of Educ.*, 2016 WL 1117643, at *12 (N.D. Ala. 2016) (applying more searching standard of review in denying renewed motion for conditional certification, and finding that "[a]n allegation that an employer knew of general overtime issues from other lawsuits is insufficient to support a motion for class certification"); *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *3 n.4 (S.D.N.Y. 2009) (denying conditional certification and finding that the plaintiff's citation of "the names and docket numbers, and nothing more, of six other lawsuits filed in various courts" against the defendant did "not add to the showing required here for certification").

Plaintiffs' suggestion that this Court should conditionally certify an almost-nationwide collective because a handful of Panera's thousands of Assistant Managers previously filed suit is particularly unconvincing in light of the multiple DOL audits that *did* reach the merits of the classification issue and blessed the exempt status of Panera's Assistant Managers at three cafes in three different states, and similarly stated that it found no overtime law violations at an additional two cafes. (*See* Young Decl. ¶¶ 3-9, Exs. 1-7.) As noted above, three of these cafes are encompassed in the geographic scope of Plaintiffs' proposed collective. (*Id.*) The DOL's findings directly contradict Plaintiffs' claim that all Assistant Managers in their proposed collective are similarly situated. Stated differently, if Plaintiffs are, as they contend, similarly situated to the

Assistant Managers whose exempt status the DOL previously analyzed and endorsed, then their claims fail on the merits and should be dismissed.

### 3. Plaintiffs Fail to Identify, Much Less Establish, a Common, Unlawful Policy That Binds the Massive Nationwide Collective

In addition to failing to establish that they and putative collective members are similarly situated with respect to the essential legal inquiry regarding actual job duties, Plaintiffs cannot point to a common *unlawful policy* that binds them. They assert that "Panera subjected all AMs to the same common, unlawful policy of misclassifying them as exempt…" (Dkt. 36-1, Pls. Mot. at 1.) As a preliminary matter, there can be no single decision, policy, or plan that violates the FLSA's exemption rules where, as described above (i) some members of the collective have testified, based on their respective job duties, that their exempt classification was appropriate and hence legal, and (ii) the U.S. DOL has similarly determined that certain members are properly classified.

As many courts have recognized, "the mere classification of a group of employees … as exempt … is not by itself sufficient to constitute the necessary evidence" that the group is similarly situated. *Bramble*, 2011 WL 1389510 at *4 (citation omitted); *see also Chemi v. Champion Mortg.*, 2006 WL 7353427, at *4 (D.N.J. 2006) (noting that if exempt classification were enough, every misclassification claim "would automatically qualify for conditional class certification"); *Brown v. Barnes & Noble, Inc.,* 252 F. Supp. at 262 (" Defendant's classification of [café managers] as exempt, standing alone, is insufficient to satisfy the low threshold for conditional certification."); *see also* cases cited *supra* at 31. Likewise, Plaintiffs' recitation of the fact that salaried-exempt Assistant Managers were not paid overtime (Dkt. 36-1, Pls.' Mot. at 15) is simply another way of saying that they were all classified as salaried-exempt—it adds *nothing* to the relevant inquiry.

As in *Federman v. Bank of America*, "[t]aking the facts in the light most favorable to [Plaintiff], at most, they demonstrate that Defendants had a policy to appropriately" classify

Assistant Managers as exempt, "but that Plaintiffs' direct supervisors may not have followed that policy." 2016 WL 3090631, at *4 (D.N.J. 2016); *see also Guillen*, 841 F. Supp. 2d at 800 (refusing to conditionally certify nationwide collective based on testimony of six assistant managers and documents demonstrating high-level corporate uniformity with respect to training and job descriptions, because evidence did not establish that assistant managers across the country were similarly required to perform primarily nonexempt duties); *Rogers v. Ocean Cable Grp. Inc.*, 2011 WL 6887154, at *4 (D.N.J. 2011) ("Although each plaintiff submitted an affidavit stating [he or she] worked in excess of 40 hours in a workweek, what they are essentially asking the Court to do is to assume that because they worked in excess of 40 … other[s] must have as well.").

Plaintiffs also argue that all Assistant Managers are similarly situated with respect to day-to-day duties because they were subject to policies regarding things like store layout, menu content, and uniforms. (By way of example, one declarant cites the fact that Panera directs stores to encourage the sales of pumpkin cookies in the fall and holiday cakes during the holiday season. (Dkt. 36-19, Thomas Decl. ¶ 11.).) Even taking assertions like these as true, these superficial similarities would not allow this Court to determine on a collective basis whether all Assistant Managers were properly classified as exempt. Simply stated, these policies do not provide a common answer to any legally relevant question about their respective job duties.

As one court recently explained, high-level corporate policies, meant to ensure basic uniformity of food service offerings to customers, have no bearing on an employee's proper classification and therefore do not constitute relevant common evidence:

> [M]any of the policies identified in Plaintiffs' declarations have no apparent nexus to Plaintiffs' claim that Defendant improperly classified CMs as exempt employees. For example, Plaintiffs state that Defendant maintains "uniform" policies concerning the pricing for cafe goods or the preparation of food/beverages. But, Plaintiffs do not contend that these policies direct CMs to personally run the registers or prepare cafe food/beverages all day instead of carrying out the

managerial responsibilities listed in their job description. **For certification purposes, there is certainly a distinction between a policy that describes the steps a barista should follow in making a latte and a policy that instructs CMs to spend their days making lattes instead of performing managerial responsibilities. This Court cannot conclude, based on the sparse evidentiary record before it, that Defendant's operational policies directed CMs nationwide to perform principally non-exempt work.**

*Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d at 264-65 (denying conditional certification) (emphasis added); *see also Harriel*, 2012 WL 2878078 at *5 ("The fact that Plaintiff alone claims he spent most of his time performing non-managerial tasks, combined with the evidence showing that the OAM position is subject to nationwide standards under Defendant's corporate policies, does not require this Court to infer that a significant number of other OAMs would have also deviated from the written job description to spend most of their time [on] non-managerial tasks.").

Finally, Plaintiffs attach a series of job postings from Panera.com (some of which are from states not at issue in this case) in a desperate bid to adduce some semblance of evidence that all Assistant Managers nationwide performed the same tasks. (*See* Dkt. 36-4, Pls.' Mot. Ex. B.) Yet, even a cursory review of these postings reveals that they are devoid of *any* detail regarding actual duties or work hours of an Assistant Manager. They merely advertise the existence of a job opening and provide a glimpse of Panera's values and culture. (Calaway-Habeck Decl. ¶ 4.) They include only generic descriptions of the role, such as Assistant Managers "**make it happen**" and "**keep it real**." (*See* Dkt. 36-4, Pls.' Mot. Ex. B.) In fact, Panera does not maintain a formal job description for Assistant Managers. (Calaway-Habeck Decl. ¶ 4.)

### 4.   Hourly-Nonexempt Assistant Managers Are Not "Similarly Situated" to Salaried-Exempt Assistant Managers

Plaintiffs' Renewed Motion contains language suggesting that they seek to conditionally certify a collective that includes both salaried-exempt and hourly-nonexempt Assistant Managers. (Pls.' Mot. at 5 ("[N]otice should issue to all AMs who worked from March 25, 2014 through the

present").) This is contrary to their Amended Complaint expressly limiting their claims to Assistant Managers *classified as exempt* (Dkt. 29 at ¶¶ 39-40), and to their previous representation that the proposed collective is limited to those who worked as salaried-exempt Assistant Managers. (Dkt. 20 at 20). Plaintiffs' own evidence, including the declarations they submitted of Ms. Calaway-Habeck and Opt-In Michele Thomas, confirms Panera reclassified salaried-exempt Assistant Managers during the course of 2016, ending on November 16, 2016. Nonetheless, their Renewed Motion persists in seemingly seeking a collective that includes all Assistant Managers who worked for Panera through present day, *including those classified as nonexempt,* based on a contrived concern that they have not been able to "investigate the veracity of Ms. Calaway-Habeck's [declaration] testimony" regarding reclassification. (Dkt. 36-1, Pls.' Mot. at 5.)

To the extent this is not a drafting oversight, it is utter nonsense. As a threshold matter, Plaintiffs chose to seek conditional certification prior to seeking discovery. Their refusal to investigate does not entitle them to certification of an overbroad collective that includes both exempt and nonexempt employees. Moreover, the Calaway-Habeck declaration *that Plaintiffs submitted* confirms the reclassification of Assistant Managers on or before November 16, 2016. Plaintiffs cannot self-servingly and inexplicably pick and choose which parts of the declaration should be relied on as true and which should not.[38] No evidence in this case (or the *Friscia* case from which Plaintiffs draw so heavily) contradicts the testimony on the point, and Opt-In Thomas's testimony confirms it. This Court has previously rejected an attempt to obtain certification of a group of employees with different classifications. *See Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 120 (D.D.C. 2004) (finding exempt employees not similarly situated to nonexempt employees).

---

[38] For example, Plaintiffs are content to submit and rely upon multiple portions of Ms. Calaway-Habeck's declaration to establish certain parts of their factual showing. (Pls.' Mot. at 4, 14 (citing Calaway-Habeck/*Friscia* declaration regarding Panera corporate structure and pay practices).)

Here, the absurdity of Plaintiffs' apparent request to certify a collective including both exempt and nonexempt Assistant Managers has the appearance of either a thinly disguised fishing expedition or a desperate attempt to set up a fictitious "split the baby" result in which a collective comprising only exempt Assistant Managers is conditionally certified. Regardless of intention, the request is baseless. While certification of any collective is improper, to the extent Plaintiffs ask this Court to send notice to persons who worked only as hourly, nonexempt Assistant Managers, their request flies in the face of their own Complaint and is devoid of legal or factual support.

### E. Plaintiffs Are Not "Similarly Situated" With Members of the Putative Collective for the Additional Reason That the Vast Majority of Them Are Bound by Agreements to Arbitrate Their Claims on an Individual Basis

Even if Plaintiffs could establish that they and the thousands of Assistant Managers they purport to represent are similarly situated with respect to their actual duties—which they do not— they would be splintered apart by an overarching reason: almost 76% of them have agreed to arbitrate their claims on an individual basis. *See* Section III.E., *supra*. "Opt-in plaintiffs who cannot bring suit in federal court are simply not similarly situated with those who can." *Morangelli v. Chemed Corp.*, 2010 U.S. Dist. LEXIS 146149, at *13-14 (E.D.N.Y. 2010) (denying conditional certification as to employees who signed binding arbitration agreements because "[t]he workers who signed [the] agreements are subject to unique defenses that cannot be bifurcated or sub-classed away"); *see also Fischer v. Kmart Corp.*, 2014 WL 3817368, at *7 (D.N.J. 2014) (denying conditional certification with respect to assistant store managers bound by arbitration agreement); *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 81 (D.N.J. 2014) ("Plaintiffs have not made a sufficient factual showing that installers who have signed mandatory arbitration or class action waiver agreements are similarly situated because [plaintiffs] have not signed any such agreement."). For the additional reason that the claims of a substantial percentage of the requested collective's members would be subject to unique defenses, Plaintiffs and the Opt-Ins are not

similarly situated with them (or with each other, given that Opt-In Thomas is subject to arbitration).

## V.   IF THIS COURT CERTIFIES A COLLECTIVE, IT SHOULD REJECT PLAINTIFFS' PROPOSED NOTICE AND CONSENT FORM

Should this Court conditionally certifies a collective, it should require the parties to work together to draft a notice and consent-to-join form. Plaintiffs' proposed documents are misleading and confusing, and their requested methods of redundant distribution are unsupported by law. Panera details its objections in its attached Notice of Objections, including the following:[39]

- Because the statute of limitations for FLSA claims is based on the date a consent-to-join form is filed, not the date a complaint is filed, the temporal period for any notice should be based on the notice date. *See* 29 U.S.C. § 256; *Cryer v. Intersolutions, Inc.*, 2007 WL 1053214 (D.D.C. 2007).

- The FLSA's standard two-year limitations period should apply in the absence of any allegation sufficient to sustain a willfulness finding. Otherwise, any notice recipients whose claims exist only in a three-year period should be advised of the possibility that their claims may be deemed untimely. Failure to do so renders the notice inaccurate and misleading.

- This court should exercise its discretion to establish a notice period of 30 days.

- The notice should inform recipients of their potential liability for costs. *E.g., Byard v. Verizon W. Virginia, Inc.,* 287 F.R.D. 365, 373 (N.D. W. Va. 2012).

- The notice should inform recipients of the likelihood of referral to arbitration if they join. *E.g., Conde v. Open Door Mktg., LLC,* 223 F. Supp. 3d 949, 969 (N.D. Cal. 2017).

- The notice and consent forms should be modified to remove any suggestion of judicial endorsement of Plaintiffs' claims and to accurately summarize the nature of Plaintiffs' claims *and* Panera's defenses.

- Notice should be issued only by United States mail. *See Castillo v. P&R Enterprises, Inc.,* 517 F. Supp. 2d 440 (D.D.C. 2007). Conversely, notice by email should not be permitted to avoid risk of contamination and unauthorized distribution. *Sharma v. Burberry Ltd.,* 52 F. Supp. 3d 443, 463 (E.D.N.Y. 2014); *Shaia v. Harvest Mgmt. Sub LLC,* 306 F.R.D. 268,

---

[39] Any objection by Plaintiffs to Panera's submission of its Notice of Objections on the grounds that it constitutes exceeding the briefing page limits should be rejected. Plaintiffs attached multiple pages of proposed notices and related documents to their Renewed Motion (Dkt. 36-15, 36-16, 36-17), and those submissions present multiple additional issues to which Panera has a right to respond.  anera nonetheless summarizes its principal objections here.

276 (N.D. Cal. 2015). Notice by text also should not be permitted. *E.g., McCoy v. RP, Inc.,* 2015 WL 6157306, at *5 (D.S.C. 2015).

• Consistent with mail-only notice, any information Defendants are ordered to produce should be limited to names and last known home addresses; Plaintiffs' request for email addresses and phone numbers should be denied.

• Plaintiffs' request for production of Social Security numbers should be denied as an unwarranted invasion of privacy. *See Byard v. Verizon W. Virginia, Inc.,* 287 F.R.D. 365 (N.D. W. Va. 2012); *Delgado v. Ortho-McNail, Inc.,* 2007 WL 2847238, at *3 (C.D. Cal. 2007).

• Notice via paycheck should be denied as unnecessarily burdensome, particular given evidence that none of the Plaintiffs/Opts-Ins is currently employed by Panera.

• Notice via a stand-alone website should be denied as injecting needless risk of avoidable disputes, particularly in the absence of information regarding specific procedures for same including consent form submission verification procedures. *See Dillow v. Home Care Network, Inc.,* 2017 WL 2418738, at *6 (S.D. Ohio 2017).

• The request for a reminder should be denied as needlessly burdensome, intrusive to recipients, "stirring up litigation," and implying judicial endorsement. *See Byard,* 287 F.R.D. at 373.

## VI.    CONCLUSION

For the reasons set forth herein, Panera respectfully requests that this Court deny Plaintiffs' Motion to certify a collective under the FLSA and/or the DCMWA. Should this Court nevertheless grant the motion, this Court should direct the parties to work together to draft an appropriate notice and consent form.

Dated: June 19, 2018                      Respectfully submitted,

By: s/ Kevin M. Young
                   Brett C. Bartlett*
                   Kevin M. Young*
                   SEYFARTH SHAW LLP
                   1075 Peachtree Street, N.E., Suite 2500
                   Atlanta, Georgia 30309-3958
                   Telephone: (404) 885-1500
                   bbartlett@seyfarth.com
                   kyoung@seyfarth.com

                   *Admitted *Pro Hac Vice*

Alexander J. Passantino
D.C. Bar No. 997340
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 828-3595
apassantino@seyfarth.com

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ALAN MEYER and DAVID CORNELIUS,

     Plaintiffs,

     v.

PANERA BREAD COMPANY,

     Defendant.

Case No. 1:17-cv-02565-EGS-GMH

**CERTIFICATE OF SERVICE**

This is to certify that I have this day, June 19, 2018, electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to Plaintiff's attorneys of record:

Sally J. Abrahamson, Esq.
Lucy B. Bansal, Esq.
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue N.W.
Second Floor West Suite
Washington, D.C. 20001

Justin M. Swartz, Esq.
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017

s/ Kevin M. Young
One of Counsel for Defendant